**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Shahrokh AHANGARAN, Defendant–Appellant.**

No. 92–3232.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1993.

Decided July 9, 1993.

Matthew V. Richmond, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Carl Ashley, Milwaukee, WI, for defendant-appellant.

Before FLAUM and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

This case involves a challenge to an evidentiary ruling of the district court judge. The defendant argues that his due process rights under the Fifth Amendment of the Constitution were violated by the district court's erro-

neous evidentiary rulings. For the reasons stated below, we affirm.

## I.

## BACKGROUND

On October 29, 1987, the Reagan administration issued an executive order which declared an embargo to prohibit the importation of Iranian origin goods and services into the United States. *See* Exec. Order No. 12613, 52 Fed.Reg. 41,940 (1987). As a result, defendant Shahrokh Ahangaran ("Shahrokh") was forced to close his business, which involved the importation of Iranian marble. Shortly thereafter, Shahrokh and his brother—Khosrow Ahangaran ("Khosrow")—developed a scheme to import Iranian (or Persian) rugs, whereby Khosrow would send Iranian rugs from Dubai, United Arab Emirates, to Shahrokh, who would sell the rugs in the United States, buy computers in the United States, and send the computers to Khosrow for marketing in places abroad, including Iran. Tr. at 493. The Iranian rugs were smuggled out of Iran using speed boats so that the Iranian export tax could be avoided. Tr. at 389–90.

Early in 1989, the Ahangaran brothers began smuggling Iranian rugs into the United States. Some rugs were sent via airmail to the home of Shahrokh's girlfriend, Patricia Senner. Tr. at 137–39, 155, 429–30. Because the brothers were concerned that too many rugs were being sent directly from Dubai to Milwaukee, they began importing some of the rugs first into Canada, from where they would ship them by airmail to the United States. Tr. at 688–89. Evidence at trial revealed that several rugs were sent by Khosrow to Shahrokh's contact in Canada.

In April 1989, Hamed Mosheni paid Shahrokh $2000.00 for four Iranian rugs, which were to be sent by commercial air to Canada. Tr. at 305, 307. On the Canadian Customs Entry Form, the country of origin for the rugs was listed as "Iran" and their value was stated as $800.00. Tr. at 113, 115–16. The rugs in fact had a retail value of approximately $28,000.00. Tr. at 514–21. These

---

* The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

rugs were then shipped to Mosheni in Milwaukee. Upon their arrival in Milwaukee, Mosheni and Shahrokh went together to the United States Customs Office to pick them up, stating to Inspector Darrell Toth that the rugs were of Pakistani origin. Inspector Toth noted that the Canadian Customs Entry Form identified their origin as Iran. Tr. at 113, 115–17. Moreover, "Made in Iran" tags remained on several of the rugs. Tr. at 146. Inspector Toth then detained the rugs and contacted Special Agent William Docken of the United States Customs Service, informing him of his suspicion that the rugs were being smuggled into the United States from Iran, in violation of the embargo. Subsequently, Shahrokh admitted to Special Agent Docken and Inspector Daniel Kakonis that these four Iranian rugs were actually his and that he had ordered them from his brother Khosrow, who had shipped them from Dubai to Canada. Tr. at 76.

In May 1989, Mehrdad Fotouhi and Alireza Amini Mohammedan ("Amini") began sharing office space with Shahrokh and Merhdad Jamnejad in Milwaukee. Between May and October 1989, Fotouhi overheard Shahrokh ask Amini if he could use his mailing address so that he could send foreign mail parcels containing Iranian rugs to that address. Fotouhi and Amini testified that they observed Shahrokh engage in the illegal importation of Iranian carpets. Tr. at 198, 213–16, 255, 670–72, 680. In October, Shahrokh offered to pay Fotouhi for the use of his mailing address. Tr. at 214, 216–18. He and Mosheni similarly asked another friend—Ilse Soriano—if they could use her mailing address to receive parcels. Tr. at 168–69. Shahrokh directed Khosrow to mail the carpets, rather than ship them commercially (which would have been much less expensive), apparently because the United States Customs Service does not have the capacity to inspect the huge quantity of foreign parcels mailed to the United States and thus relies on the integrity of the senders and receivers for enforcement of the embargo laws.

Several packages containing Iranian rugs were sent to the various Milwaukee addresses which Shahrokh had made arrangements to use. Shahrokh later admitted to Special Agent Docken and Inspector Kakonis that the numerous packages containing Iranian rugs which arrived at these addresses in Milwaukee were actually his and that he knew that it was illegal under the embargo to import these rugs from Iran into the United States. Tr. at 76, 224, 386–87. Several "coded" letters were sent between the Ahangaran brothers during this time, referring to computer deals in Iran and emphasizing the importance of removing "Made in USA" labels from the computers. Tr. at 358–60, 557. Shahrokh sent several packages containing computers to his brother in Dubai. Shahrokh later admitted to Special Agent Docken that he also illegally imported into the United States three Iranian Khalim rugs. Tr. at 391.

In May 1991, a grand jury returned a six-count indictment against Shahrokh, alleging offenses arising out of his illegal importation of Iranian rugs, contrary to the United States trade embargo with Iran. Shahrokh pleaded not guilty to these charges. In December 1991, a plea agreement was filed. However, Shahrokh failed to enter a plea of guilty pursuant to the agreement. After an eight-day jury trial, Shahrokh was found guilty of all but one count, and sentenced to eighteen months in prison.

During the trial, the government objected on relevance grounds to certain questions asked by the defense during the direct examination of Inspector Toth, who had been recalled to testify in the defendant's case. Defense counsel was attempting to question Inspector Toth about the civil licensing procedure for Iranian goods set forth in the Code of Federal Regulations and its application in other cases. The district court sustained the government's objection. It is from this ruling (and the district court's general treatment of this issue) that the defendant now appeals.

## II.

### ISSUE

Whether the district court abused its discretion in ruling that 31 C.F.R. § 560.504 was not relevant to this case.

## III.

### DISCUSSION

■ On appeal, the defendant argues that the district court committed reversible error in violation of the due process clause of the Fifth Amendment when it precluded him from presenting the "primary evidence" of his defense. His challenge is to a series of evidentiary rulings made by the district court during the defendant's direct examination of Inspector Toth. Shahrokh claims that because they precluded presentation of evidence pertaining to 31 C.F.R. § 560.504, these evidentiary rulings had a substantial effect on his rights and resulted in actual prejudice by their influence on the jury's verdict. Determinations of the district court's rulings on the admissibility of evidence are subject to an abuse of discretion standard. *United States v. Hughes,* 970 F.2d 227, 232 (7th Cir.1992); *United States v. McNeese,* 901 F.2d 585, 598 (7th Cir.1990); *United States v. Perez,* 870 F.2d 1222, 1225 (7th Cir.), *cert. denied,* 493 U.S. 844, 110 S.Ct. 136, 107 L.Ed.2d 95 (1989).

In the indictment, Shahrokh was charged with a violation of 31 C.F.R. § 560.201, which prohibits the importation of Iranian goods. In his appeal, he alleges that he should have been allowed to introduce evidence of 31 C.F.R. § 560.504, which allows upon proper documentation the licensing of Iranian origin goods which were outside Iran prior to the effective date of the executive order. Shahrokh argues that the district court should have allowed him to question Inspector Toth regarding the licensing procedure set forth in 31 C.F.R. § 560.504.

During the defense' direct examination of Inspector Toth, the government objected when defense counsel attempted to elicit from Inspector Toth evidence on other cases in which a specific license had been issued by the United States Office of Foreign Assets Control, authorizing the importation of Iranian rugs. The examination went as follows:

Q. What is the procedure?

A. It's basically once the carpets come in, we seize the carpets. At that point, the individual applies to the Foreign Assets Control for the hope of issuance of a license to import these particular carpets.

Q. And have you had occasion to be involved in that procedure taking place in other instances?

A. There have been other cases where carpets have been returned to the importers.

Q. And do you know what, if any, penalty the shipper incurred?

MR. RICHMOND [Government]: Your Honor, I would object to the question. I would say it's collateral, it's not relevant. We're dealing with a smuggling case, not an innocent person bringing a rug into the United States.

MR. ASHLEY [Defense]: Your Honor, at this point I think it's been established that in fact the carpets came from Canada marked as Iranian carpets that but for the statement that was allegedly made about Pakistan, I believe Mr. Toth would have advised him [Shahrokh] of the application procedure. I'm trying to assess at this point whether that opportunity was ever given to Mohammed Mosheni once he confronted the customs agent about these carpets.

.    .    .    .    .

THE COURT: Number one, there is no count in the indictment involving these carpets, is there? They're applicable only as to Count One of the indictment to conspiracy, and the case that we're trying here is not a civil case involving possession of carpets, but it's a criminal case alleging fraud. Now, it's up to the factfinder to determine whether or not what occurred with reference to the four Canadian carpets constituted an attempt to circumvent the embargo or not, where there was fraud or not.

MR. ASHLEY: My concern is that if in fact Mohammed Mosheni in receiving these carpets mistakenly or was frightened and mentioned the word Pakistan once he realized the word is Iranian caused a problem which started the whole ball rolling when he could have said yes, they're from Iran.

THE COURT: But that doesn't obviate the fraud. I sustain the objection. This is not a civil case. If there is no fraud involved, then your client will not get convicted.

Tr. at 780–82.

■ A trial court has broad discretion in determining the relevance of evidence. *United States v. Wellman*, 830 F.2d 1453, 1468 (7th Cir.1987). *See also United States v. Blanton*, 884 F.2d 973, 977 (7th Cir.1989) ("Whether evidence is relevant is a matter committed to the district court's discretion. . . ."). Under Rule 401, evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed.R.Evid. 401. Under Rule 402, evidence is not admissible if not relevant. Fed.R.Evid. 402.

■ In this case, the defense counsel's questioning of Inspector Toth concerning procedures followed by other importers or instructions given by customs personnel to other persons about the licensing procedure clearly was not relevant. The actions of persons other than the defendant in obtaining a license for the importation of Iranian rugs simply had no relevance to this case. Moreover, while the district court sustained the government's objection concerning what was told by Inspector Toth to *other persons* about the licensing procedure, the court specifically stated that it would permit the defense to go into the area of the general procedure. Tr. at 782. Accordingly, the district court properly allowed the defense to question Inspector Toth regarding the licensing procedure itself.

Also, during the defense counsel's cross-examination of Inspector Toth (in the government's case-in-chief), the government objected to the defense's questioning regarding the licensing procedure because it was outside the scope of the government's direct. This was a valid objection. The district court at that time advised defense counsel that if evidence of the licensing procedure was going to be admitted, "[the defense is] going to have to put it in yourself." Tr. at 152.

Following the judge's suggestion, the defense did in fact offer the testimony of at least four witnesses regarding the licensing procedure. Tr. at 664–67 (testimony of Amini), 751–56 (testimony of Dave A. Salentine), 779–80 (testimony of Toth), 901–02 (testimony of Shahrokh). Moreover, the district court actually read to the jury the language of 31 C.F.R. § 560.504. Despite all of this evidence, it appears that the licensing procedure described in 31 C.F.R. § 560.504 never became relevant to this case as Shahrokh failed to present any credible evidence that the rugs were outside of Iran at the time that the embargo became effective. Although Shahrokh did attempt to introduce in the cross-examination of a government witness an invoice for some rugs (dated July 25, 1986—thus implying that some rugs were sold and exported from Iran prior to the effective date of the executive order), it was properly excluded because it was outside the scope of the direct. *See* Br. of Appellant, App. at 121 (invoice, dated July 25, 1986). Moreover, the credibility of the document was seriously called into question by the government. For some reason, Shahrokh failed to attempt to introduce this invoice as evidence in his own case.

As is clear from the explicit language of the regulation, the licensing procedure described in 31 C.F.R. § 560.504 was applicable only where it could be proven that the goods in question were located outside Iran prior to the effective date of the executive order and that no payment or other benefit had accrued or would accrue to Iran after the effective date. Shahrokh provided no evidence that the rugs were outside of Iran prior to the effective date of the executive order. Had he offered such evidence, the regulation in question might have been relevant.

During its case-in-chief, the government established that, beginning in January 1989, fourteen months after the embargo went into effect, the Ahangaran brothers began smuggling Iranian rugs into the United States. As noted above, the defense failed to introduce any evidence even to suggest that the carpets were outside Iran at the time that the executive order took effect, so that the licensing procedure might have been applica-

ble. Accordingly, the district court did not abuse its discretion in determining that 31 C.F.R. § 560.504 was not relevant to this case.

## IV.

## CONCLUSION

For the reasons articulated above, the ruling of the district court is AFFIRMED.