STATE of Wisconsin, Plaintiff-Respondent,

v.

David BUCK, Defendant-Appellant.†

Court of Appeals

*No. 96–1135–CR. Submitted on briefs February 6, 1997.—Decided April 9, 1997.*

(Also reported in 565 N.W.2d 168.)

†Petition to review denied.

117

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael T. Norris* of Schaumburg, Illinois, and *Charles W. Giesen* of *Giesen & Berman, S.C.* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sharon Ruhly*, assistant attorney general.

Before Snyder, P.J., Brown and Anderson, JJ.

SNYDER, P.J. David Buck appeals from judgments of conviction for two counts of homicide by intoxicated use of a vehicle; two counts of homicide by negligent operation of a vehicle; and one count of injury by intoxicated use of a vehicle. He raises the following issues in which he claims the trial court erred: (1) in denying his motion to suppress written answers he gave to a police officer from his hospital bed, without the benefit of *Miranda*[1] warnings; (2) in determining that various blood alcohol concentration (BAC) evidence was admissible, some of it pertaining to several individuals besides Buck; and (3) in failing to dismiss the two counts of homicide by negligent operation of a vehicle as multiplicitous.

We affirm the trial court's evidentiary rulings related to the admissibility of the BAC evidence, but we hold that the written answers Buck gave at the hospital should have been suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). However, we conclude that the error was harmless. We also accept the State's concession that the homicide charges against Buck were multiplicitous, and therefore remand for resentencing on the valid convictions.

At approximately 8:00 a.m., after finishing a third shift, Buck went to Gary Maurer's residence. Upon arrival, Buck and Maurer each consumed a beer. A short time later, after Jeff Lowery and Matt

---

[1] *See Miranda v. Arizona,* 384 U.S. 436 (1966).

Gunnufson arrived, Maurer went to a nearby store and bought three twelve-packs of beer.

Maurer testified that from approximately 8:00 a.m. until approximately 11:30 a.m., the men "talked about work, chewed the fat and we had a couple beers and that's about it."[2] Shortly after 11:30 a.m., the group decided to go to get something to eat. Buck left in his car with Gunnufson; Maurer and Lowery each drove separately. They planned to meet at a local bar. When Maurer and Buck arrived at the bar, they discovered that it was closed.[3] According to the testimony of the bar owner, Kathleen Kraus, who was inside when Buck and Maurer pulled up, she saw the cars "squealing in the parking lot" and also testified that "the stones were flying, you know, and all of a sudden they were on my neighbor's lawn."

The two cars then left the parking lot together, with Buck and Maurer driving. Just prior to the accident which underpins the charges in this case, Matthew Savola testified that in his rearview mirror he saw a Trans Am and a station wagon rapidly approaching. Because Savola observed a stop sign ahead, he slowed down and brought his truck to a stop. Savola then testified that the Trans Am approached rapidly, coming to a stop behind his truck and angled toward the ditch at the side of the road. According to Savola and another eyewitness, the station wagon driven by Buck made no attempt to stop at the intersection; instead, it continued to approach at a rate of speed estimated to be 50 to 60 miles per hour, pulled

---

[2] While there was no definitive testimony as to how much beer Buck consumed, both Maurer and Lowery testified that all four men were drinking about the same amount, and Lowery said that Buck had consumed approximately eight beers.

[3] Lowery did not show up at the bar.

around the two stopped vehicles, and broadsided a van driven by Melvin Schlichting. As a result of the accident, Gunnufson and Schlichting died at the scene; Schlichting's wife, Grace, was injured.

Upon arriving at the scene of the accident, Deputy Robert Pagel talked to Buck as he was being placed in an ambulance. Buck responded to Pagel's initial questions; he gave his name and said he had been coming from a bar at the time of the accident. During this initial questioning, Pagel detected an odor of alcohol. Pagel then asked Buck how the accident occurred, but he received no response. Pagel then informed Buck that he was placing him under arrest and Buck was transported to Calumet Medical Center.

At the medical center, Pagel informed the staff that Buck was under arrest and that he was requesting a legal blood draw to be analyzed for the presence of alcohol or drugs.[4] Three vials of blood were drawn; they were then sealed in a package and sent to a state lab for analysis.

The following day, Investigator Oscar Beilke went to Theda Clark Regional Medical Center, where Buck had been transferred, to speak with Buck. Buck was a patient in the intensive care unit of the medical center. Due to a tracheotomy, he was unable to talk and had to converse by writing notes.

Beilke advised Buck that he needed to question him regarding his activities leading up to the accident.

---

[4] By the time Pagel requested the blood draw, the medical staff had already started I.V. lines in Buck's arms. Although the nurse drawing the blood asked a pharmacist who was in the room to turn off the I.V. so as not to dilute the sample of drawn blood, she could not say for sure whether that had been done. The nurse also testified that if a blood sample is diluted with I.V. solution, it would lower the measurable BAC level.

He told Buck that he knew Buck had been at Maurer's residence the morning of the accident and that he was also aware that Buck and his friends had been drinking. He then questioned Buck about how much he had had to drink and what he remembered of the accident. Buck responded by writing on a sheet of paper. At no point did Beilke advise Buck of his *Miranda* rights.

Prior to trial, Buck brought motions to suppress the written answers he gave Beilke from his hospital bed and to suppress the results of his blood alcohol test.[5] The trial court found that "although the defendant was in custody at the Calumet Medical Center, he was released from that law enforcement custody at the hospital when he was transferred via helicopter to Theda Clark Medical Center." The court then concluded that it was not necessary to advise Buck of his *Miranda* rights before Beilke questioned him. Defense counsel withdrew a motion to suppress the results of the blood alcohol tests, conceding that under the reasoning of *State v. Disch,* 119 Wis. 2d 461, 351 N.W.2d 492 (1984), it was "impossible to proceed on [the] motion to suppress the blood alcohol."[6]

Following a bench trial, Buck was found guilty of two counts of homicide by intoxicated use of a vehicle; two counts of homicide by negligent operation of a vehicle; and one count of injury by intoxicated use of a vehicle, all subject to repeater enhancements. He was sentenced to a total of twenty-seven years on the first, second and fifth counts, and to five years of probation,

[5] A third motion, not pertinent to this appeal, was brought to amend the conditions of bail.

[6] The defense theory had been to request suppression of the BAC results because they were "so inaccurate, and the test was so bollixed, and so mishandled, that it should be suppressed."

consecutive to the prison time, on the third and fourth counts. Buck now appeals.

## Motion to Suppress

Buck first claims that the answers he gave in response to Beilke's questions while he was hospitalized should have been suppressed. After being placed under arrest at the scene of the accident and taken to Calumet Medical Center, Buck was subsequently transferred to Theda Clark Regional Medical Center. He was questioned the following day by Beilke without the administration of *Miranda* warnings. He argues that the evidence resulting from that exchange should have been suppressed because it was a custodial interrogation which did not properly advise him of his *Miranda* rights.

*Miranda* held that the prosecution could not use statements resulting from a custodial interrogation of a defendant. *See Scales v. State,* 64 Wis. 2d 485, 489, 219 N.W.2d 286, 289 (1974). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody . . . ." *See Miranda,* 384 U.S. at 444. "[T]he conditions of custody or other[] deprivation of freedom requiring *Miranda* warnings [are] those caused or created by the authorities." *State v. Clappes,* 117 Wis. 2d 277, 285, 344 N.W.2d 141, 146 (1984).

In the instant case, it is uncontroverted that Buck was placed under arrest in the ambulance before he was transferred to the hospital. The State has argued that in spite of that "[Buck's] arrest was for the sole purpose of obtaining a blood sample" and notes with approval the trial court's analysis that "although the defendant was in custody at the Calumet Medical

123

Center, he was released from that law enforcement custody at the hospital when he was transferred via helicopter to Theda Clark Medical Center." We disagree.

Whether a person is in custody for *Miranda* purposes is a question of law to which a reviewing court owes no deference to the trial court's determination. *See State v. Pounds,* 176 Wis. 2d 315, 320, 500 N.W.2d 373, 376 (Ct. App. 1993). In the instant case, there is no dispute that Buck was placed in custody when he was arrested in the ambulance. The only issue is whether that custody was somehow interrupted and discontinued, such that the *Miranda* warnings were unnecessary.

The State makes much of the fact that "the circumstances surrounding the defendant's stay at Theda Clark Hospital and Beilke's interview with the defendant at Theda Clark would not have led a reasonable person to believe he was in custody." However, in *Scales* an unresponsive defendant was placed under arrest by the issuance of two citations which were placed on the defendant's chest. *See Scales,* 64 Wis. 2d at 488, 219 N.W.2d at 289. The supreme court there held, "[The defendant] was under arrest. To say that he was not in custody, either because he was not conscious and did not realize he was arrested or because he was not explicitly told that he was in custody, is sophistry." *Id.* at 492, 219 N.W.2d at 291.

In the instant case, Buck was formally arrested while he was conscious in the ambulance. The circumstances which followed cannot be said to have "discontinued" the earlier arrest. Under *Scales,* the determination is not based on the defendant's

perception of whether he or she is under arrest; the fact of the arrest is premised on the actions of the officer. Buck was placed under arrest in the ambulance. The statement Buck made to Beilke was during a custodial interrogation, without the benefit of *Miranda* warnings, and was therefore inadmissible.

■■■

This error, however, was harmless. We will reverse only where there is a reasonable possibility that the error contributed to the final result. *See State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985). In making this determination, we weigh the effect of the inadmissible evidence against the totality of the credible evidence supporting the verdict. *See State v. Britt,* 203 Wis. 2d 25, 41, 553 N.W.2d 528, 534 (Ct. App. 1996).

The information contained in Buck's statement was as follows: that prior to the accident he had had "a couple of beers" but not enough to be drunk; that he had been drinking from approximately 7:30 a.m. until around noon; that he did not realize that there was a stop sign at the intersection; and that he saw the van just prior to striking it. Of this evidence, the statement that in his opinion he had not had enough alcohol to be impaired was placed into evidence along with his BAC test results and measured against eyewitness testimony about his driving just prior to the accident.

There is no reasonable probability that Buck's conclusion that he was not too drunk to drive contributed to the verdict. His statement relating to the length of time he had been drinking was placed before the court by other witnesses. The remaining information contained in the statement regarding his ability to see the stop sign and when he saw the van related solely to the issue of negligence. Because we

have determined that the negligence convictions were multiplicitous and will be vacated, the impact of these evidentiary issues with regard to Buck's negligence need not be addressed.

### Blood Alcohol Testing

The next claims of error that Buck raises all relate to BAC evidence which was placed before the trial court. Buck specifically claims that the trial court erred when it admitted BAC results where the chain of custody was flawed, when it found the BAC results to be accurate, when it allowed a state chemist to testify as to certain hypothetical questions, and in admitting Exhibits 21 (BAC analysis for Maurer), 22 (BAC analysis for Gunnufson) and 23 (BAC report prepared by the state chemist).

In *Disch,* 119 Wis. 2d at 480, 351 N.W.2d at 502, the supreme court stated:

> Assuming that a blood test is administered under the rules set forth in the statutes and assuming that a suspect is properly advised by the police agency, a test result of a blood sample which is properly authenticated is admissible and is not to be excluded from evidence. The test . . . may be discredited and its evidentiary weight attacked, but it is nonetheless admissible.

Therefore, the trial court was correct in ruling that the BAC tests were admissible. On appeal, Buck argues that the chain of custody was flawed with regard to the three tubes of blood which were obtained from him in the emergency room and sent to the state lab.

Buck, however, did not raise this argument to the trial court. He did not object to the admission of the

BAC evidence on the basis of an incomplete chain of custody.[7] In order to preserve a claim of evidentiary error, a timely objection must be made. *See State v. Edwardsen,* 146 Wis. 2d 198, 211, 430 N.W.2d 604, 609 (Ct. App. 1988). We conclude that Buck has waived review of this issue.

The next two BAC issues Buck raises both go to the weight to be given the particular evidence, not to its admissibility. Buck first argues that the trial court erred when it found his BAC results to be accurate after he presented evidence that the tube of blood first analyzed by the State "was, in fact, contaminated and

---

[7] Buck argues in his reply brief that because the nurse who drew the blood samples testified that she *filled* three test tubes with blood, and the chemist who received the box containing the test tubes testified that one tube contained only a small amount of blood in the bottom of the tube, "the State as proponent of that evidence did not even show that the blood received at the hygiene lab was the evidence originally received at the hospital." However, our review of the record fails to show where defense counsel made this argument to the trial court.

The degree of proof necessary to establish a chain of custody is a matter of trial court discretion. *See B.A.C. v. T.L.G.,* 135 Wis. 2d 280, 290, 400 N.W.2d 48, 53 (Ct. App. 1986). As long as sufficient testimony is received that renders it improbable that the original item has been exchanged or tampered with, the evidence is properly received. *See id.* The officer testified that he delivered the sealed package to a secretary, who mailed it. The state chemist testified that her examination of the test tubes of blood showed that all three were sealed. "The fixing of a bright line chain of custody or authentication rules for all cases is impossible because each case requires a judgmental determination whether sufficient guaranties exist that the evidence proffered truly relates to those matters or things which are relevant to the case." *Id.* at 291, 400 N.W.2d at 54.

that the contamination possibly extended to all three tubes, and definitely to at least two of the tubes."

The comparative weight to be given to positive and negative testimony is dependent upon the credibility of the witnesses. *See Resseguie v. American Mut. Liab. Ins. Co.,* 51 Wis. 2d 92, 107, 186 N.W.2d 236, 244 (1971). While Lisa Ruhland, a chemist, testified that the tests she ran showed that the initial BAC result obtained from a single tube of Buck's blood was inaccurate, and that at least two of the three tubes collected were "contaminated," she also explained that the contamination only referred to a dilution of the blood sample by another fluid.

Ruhland further explained that this was most likely a result of I.V. fluids mixing with the blood at the site of the blood draw, and that this contamination was evident to her upon further testing because a test of the hemoglobin levels of the three tubes of blood drawn after the accident produced three different values.[8] Having explained why the three tubes of blood each yielded a different BAC, Ruhland also explained that if the one tube of blood which registered the highest hemoglobin level were also contaminated, then an uncontaminated sample of Buck's blood would produce an even *higher* BAC reading than what she obtained.

---

[8] The normal range for a hemoglobin level in a healthy male is a value of 14 or 15. The first tube of blood the chemist tested yielded a value of 9; the second tube yielded a value of 15.2; and the third tube of blood yielded a value of 14.1. Based on these values, the chemist concluded that the second tube most closely approximated Buck's actual hemoglobin level. Therefore, the BAC level obtained from that tube of blood was the most accurate.

Having heard all of this testimony, the trial court did not err in the weight it afforded this evidence.

The third argument Buck makes is that the trial court should not have allowed into evidence Ruhland's opinion on a hypothetical question posed by the State. Trial courts have wide discretion regarding the admission of opinion testimony by an expert witness. *See State v. Pittman,* 174 Wis. 2d 255, 268-69, 496 N.W.2d 74, 79-80 (1993). Furthermore, Buck concedes that "support in the record for assumptions made in a hypothetical question is to be tested and determined at the conclusion of testimony" and cites *Piorkowski v. Liberty Mutual Ins. Co.,* 68 Wis. 2d 455, 462, 228 N.W.2d 695, 699-700 (1975). If a defendant does not renew an objection to the question at the completion of the testimony and move to strike the question and answer, he or she waives the final opportunity to object to the testimony. *See Schulz v. St. Mary's Hosp.,* 81 Wis. 2d 638, 653, 260 N.W.2d 783, 788 (1978). We conclude that Buck has waived his right to raise the issue relating to the admissibility of Ruhland's response to the posed hypothetical.

Buck also claims that the trial court erred when it admitted into evidence the results of Maurer's and Gunnufson's BAC analysis, as well as a summary report prepared by Ruhland. A trial court has wide discretion in determining whether to admit evidence. *See United States v. Ahangaran,* 998 F.2d 521, 525 (7th Cir. 1993). We will not disturb that discretionary determination unless the trial court's actions constitute a misuse of that discretion. *See Keithley v. Keithley,* 95 Wis. 2d 136, 140, 289 N.W.2d 368, 371 (Ct. App. 1980).

The trial court had received testimony that Gunnufson, Maurer and Buck had been drinking before the accident, and that each had consumed similar amounts of alcohol. The State offered the BAC test results of the two men Buck had been drinking with in order to substantiate Buck's test results. The report objected to was a compilation of Ruhland's analysis and represented nothing more than a written record of testimony that had already been received. We conclude that the trial court properly exercised its discretion in admitting both Ruhland's report and the test results of Buck's drinking partners.

### Multiplicitous Charges

 As a final claim of error, Buck maintains that his convictions for homicide by intoxicated use of a vehicle and homicide by negligent operation of a vehicle are multiplicitous. The State concedes that § 939.66(2), STATS., prohibits charging a defendant with both homicide charges where they both arose from a single death. Specifically prohibited is convicting a defendant of "[a] crime which is a less serious type of criminal homicide than the one charged." *See id.* Homicide by negligent operation of a vehicle is a less serious type of homicide than homicide by intoxicated use of a vehicle, and we therefore accept the State's concession of error.

Having concluded that Buck was illegally sentenced on two homicide charges for each of the deaths, we further conclude that the remedy is to vacate the illegal convictions for homicide by negligent operation and remand for resentencing. This remedy is in keeping with the holding of *State v. Martin,* 121 Wis. 2d 670, 678-79, 360 N.W.2d 43, 47-48 (1985), where the court states, "A series of Wisconsin cases involving

challenges to convictions under lesser included offenses and under enhancement statutes implicitly demonstrates this court's view of the illegality of the sentence for the unchallenged conviction." The court has repeatedly concluded that "the initial sentence 'was invalid as a multiple punishment for a single crime.' " *Id.* at 680, 360 N.W.2d at 48 (quoted source omitted). When a defendant is convicted of and sentenced for two offenses which are later held to be the same offense, the validity of both punishments is implicated. *See id.* at 681, 360 N.W.2d at 49. In such a case, "the sentences for both offenses are illegal, and resentencing on the valid conviction is permissible." *Id.*

In sum, we affirm the trial court's discretionary determination to admit the BAC evidence; we hold that while it was error to admit Buck's responses to Beilke's questions which were obtained without giving Buck his *Miranda* warnings, that error was harmless; and we reverse the convictions for homicide by negligent operation of a vehicle, with instructions to the trial court to resentence Buck on the remaining counts.

*By the Court.*—Judgments affirmed in part; reversed in part and cause remanded with directions.