COURT OF APPEALS
DECISION
DATED AND FILED

August 21, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP1750-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CT335

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

CHRISTOPHER J. DURSKI,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Walworth County: PHILLIP A. KOSS, Judge. *Affirmed*.

¶1 GUNDRUM, J.[1] Christopher Durski appeals from a judgment of conviction for operating a motor vehicle while intoxicated, fourth offense. He

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

claims the court erred in denying his suppression motion and in permitting certain expert testimony on retrograde extrapolation. We conclude the court did not err, and we affirm.

***Suppression Motion***

Background

¶2 The relevant evidence from the hearing on Durski's suppression motion is as follows. After being involved in a family dispute in the early morning hours of October 22, 2016, Durski drove to a nearby motel. Dispatched to the home where the dispute took place, an investigating officer learned that Durski had possibly consumed alcohol before departing the residence. The officer went to the motel where Durski was staying and learned from an employee that Durski "had checked in a short while earlier." The officer testified that he made contact with Durski in his motel room approximately twenty-five to thirty minutes after the family dispute/disorderly conduct call.

¶3 Durski informed the investigating officer that he had earlier consumed "[t]hree or four beers and a shot of blackberry brandy." He also initially told the officer that "he had not drank or had any intoxicants in his [m]otel room." After the officer told Durski he was aware Durski had driven to the motel following the family dispute and he wanted to conduct field sobriety tests (FSTs) to make sure Durski was in a sufficient condition to drive, Durski then told the officer that he had consumed two beers after he arrived at the motel. The officer asked Durski "what kind of containers they were in, what kind of brand of beer it was, and where could the containers be located," so the officer "could confirm that."

2

¶4 The investigating officer administered FSTs just outside of Durski's motel room, with two other officers also present. Following those tests, the officer attempted to administer a preliminary breath test (PBT) to Durski but the PBT he had with him malfunctioned so a second officer went to his squad car to get his PBT and also attempted to find "12-ounce Bud Lite cans" Durski had described drinking from after arriving at the motel. The investigating officer testified that "before making a final arrest decision," he "wanted to clarify" whether or not Durski had consumed alcohol after arriving at the motel. During this approximately five- to ten-minute period of time, the investigating officer remained with Durski in his motel room and "[tried] to get some clarification on where the beer cans were, where we would locate them." Durski told the officer

> that they would be in the garbage can outside the door ...
> and I was clarifying like the front hotel, in front of the
> hotel, and then things got really vague and things started
> changing, and then it was one may be in his truck or
> outside of his truck or he littered one or one in this garbage
> can.

The officer testified that they checked "everything that he had said that was a possibility, to include littered cans on the road" to see if they could confirm Durski's story about having consumed beer after arriving at the motel. The officers were unable to find the beer cans.

¶5 After the second officer returned with the PBT, Durski submitted to that test. Around that time, a third officer informed the investigating officer over the radio that Durski "should be placed under arrest for disorderly conduct" because of the incident at the house. The investigating officer testified that even prior to that time, Durski was not free to leave because the officers "were investigating a number of different things," however, the investigating officer had not indicated to Durski that he was under arrest. The officer testified that had

3

Durski satisfactorily completed the FSTs, he would not have been arrested for OWI. The officer further indicated it also was questionable whether Durski would have been arrested for OWI if the officers had actually located the "12-ounce Bud Lite cans" corroborating Durski's story of having consumed beer after arriving at the motel. The officer testified that he was in full uniform and armed during his encounter with Durski, but that at no time did he draw his weapon.

¶6 The circuit court found that Durski was not free to leave while the investigating officer was questioning him because he was being detained under reasonable suspicion. The court found it "completely credible that [the officers] are looking to see if these cans are there," and if so, that

> they may believe there is not probable cause to arrest.
>
> … if he drank two or more cans after getting there, after he stops driving, they're not going to arrest. I think if it was otherwise, they would have just arrested him immediately, they wouldn't bother to take these steps to try and determine it.

The court further found that the investigating officer was "chatty with [Durski]. It's conversational; it's not accusatory at this point. They're really trying to determine where these cans are, if they exist." The State conceded and the court determined that any statements Durski made after he was placed under arrest but before he was later *Mirandized*[2] should be suppressed. The court implicitly

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

denied the request to suppress any statements made by Durski prior to the time he was formally arrested.[3]

Discussion

¶7      Durski claims the circuit court erred in denying his motion to suppress statements he made when the investigating officer questioned him at the motel prior to issuing him the **Miranda** warnings.  Durski insists the court erred because "he was already a suspect in [the] disorderly conduct investigation; was not permitted to leave the scene at the time; and was subjected to express, and specific, questioning which was reasonably likely to elicit an incriminating response."

---

[3] One could argue that Durski has forfeited any challenge to the circuit court's ruling in this case.  In his suppression motion, Durski asserted that

> [a] reasonable person in Mr. Durski's position, having been not only *placed in handcuffs* but actually *told he was under arrest*, would consider himself to be "in custody."  Therefore, any statements made by Mr. Durski *after* he was placed in custody and questioned by officers without being advised of his rights under Miranda must be suppressed.

(Emphasis added.)

At the suppression hearing, Durski asserted that "it's *arguable* whether he was in custody [prior to the other officer telling the investigating officer that he should arrest Durski for disorderly conduct], but certainly *after* that he knew that he was arrested." (Emphasis added.)  In its ruling following testimony and argument at the hearing, the court stated that any statements by Durski *after* the officers placed him under arrest for disorderly conduct were "suppressable." When the court then asked if any clarifications were needed, Durski declined to seek any clarification.  Thus, it appears as if Durski may have received the ruling he originally sought in his motion and failed to sufficiently assert that a different ruling—suppressing statements Durski made prior to formal arrest—was required in light of the testimony at the hearing.  However, because the State fails to argue that Durski forfeited his appellate challenge, we do not affirm on that basis.

¶8      If Durski's statements resulted from interrogation conducted while he was "in custody," then the pre-*Miranda* statements would be subject to suppression. *See State v. Morgan*, 2002 WI App 124, ¶26, 254 Wis. 2d 602, 648 N.W.2d 23.  If, however, Durski was merely temporarily detained for investigative purposes, and was not actually in custody, his statements would not be suppressed even though *Miranda* warnings were not administered. *See State v. Goetz*, 2001 WI App 294, ¶¶10, 17, 249 Wis. 2d 380, 638 N.W.2d 386; *State v. Gruen*, 218 Wis. 2d 581, 589, 582 N.W.2d 728 (Ct. App. 1998).

¶9      The circuit court's findings of fact from the suppression hearing will be upheld so long as they are not clearly erroneous. *See State v. Mosher*, 221 Wis. 2d 203, 211, 584 N.W.2d 553 (Ct. App. 1998).  Whether Durski was in custody at the relevant time is a legal question we review de novo. *See State v. Buck*, 210 Wis. 2d 115, 124, 565 N.W.2d 168 (Ct. App. 1997).

¶10     Just last year, our state supreme court provided an in-depth explanation of "what 'in custody' means":

> The test to determine whether a person is in custody under *Miranda* is an objective test.  The inquiry is "whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest."  Looking at the totality of the circumstances, courts will consider whether "a reasonable person would not feel free to terminate the interview and leave the scene."
>
> We consider a variety of factors to determine whether under the totality of the circumstances a reasonable person would feel at liberty to terminate an interview and leave.  Such factors include:  the degree of restraint; the purpose, place, and length of the interrogation; and what has been communicated by police officers.  "When considering the degree of restraint, we consider:  whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether

questioning took place in a police vehicle, and the number of officers involved."

> If we determine that a suspect's freedom of movement is curtailed such that a reasonable person would not feel free to leave, we must then consider whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." In other words, we must consider whether the specific circumstances presented a serious danger of coercion, because the "freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." Importantly, a noncustodial situation is not converted to one in which *Miranda* applies simply because the environment in which the questioning took place was coercive. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it ... [b]ut police officers are not required to administer *Miranda* warnings to everyone whom they question." Therefore, "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" And finally, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."

*State v. Bartelt*, 2018 WI 16, ¶¶31-33, 379 Wis. 2d 588, 906 N.W.2d 684 (footnote omitted; citations omitted).

¶11 Applying the facts of this case to this guidance from our supreme court, we agree with the circuit court that Durski was not "in custody" until he was formally placed under arrest. Until that time, he was not told he was under arrest and there is no indication his freedom of movement was restrained to a degree associated with a formal arrest. Based upon the totality of the circumstances, it would have been obvious to any reasonable person in Durski's position that he was being temporarily detained for investigative purposes, and all indications were that he likely would not have been arrested for OWI if his story about consuming beer after arriving at the motel could have been corroborated through the

investigation. The investigating officer's questioning of Durski lasted only a few minutes and took place in the motel, as opposed to the back of a squad car or a police department interrogation room, and he was not transported to another location for questioning. Durski was not handcuffed, no weapons were drawn on him, and no other show of force was utilized. The court found the tone of the questioning was "conversational," and "not accusatory." While there were three officers present during the performance of the FSTs, under the totality of the circumstances, this fact does not raise the detention to the level of "custody."

¶12    Because we conclude Durski was not in custody prior to formal arrest, the officers made no error in not *Mirandizing* him prior to eliciting the pre-arrest statements he challenges. We affirm the circuit court's denial of his suppression motion.

### Expert Testimony on Retrograde Extrapolation

¶13    Durski also argues that the circuit court erred in permitting a state toxicology expert to testify "[without] conducting a proper *Daubert*[4] hearing, when Mr. Durski had consumed several alcoholic beverages after the time of driving."[5]  We review a circuit court's decisions on whether to hold a *Daubert* hearing and whether to admit expert testimony at trial for an erroneous exercise of discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999) (explaining that circuit courts have the "discretionary authority needed … to avoid

---

[4] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[5] Durski also appears to make numerous conclusory mini-arguments, all of which are insufficiently developed. Because they are insufficiently developed, we do not address them. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted"); *see also* ***United States v. Pena***, 586 F.3d 105, 110 (1st Cir. 2009); ***United States v. Mitchell***, 365 F.3d 215, 233 (3rd Cir. 2004); ***United States v. Alatorre***, 222 F.3d 1098, 1102-03 (9th Cir. 2000); ***United States v. McCluskey***, 954 F. Supp. 2d 1224, 1237 (D.N.M. 2013); ***Louis Veitton Malletier v. Dooney & Bourke, Inc.***, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007); ***State v. Giese***, 2014 WI App 92, ¶16, 356 Wis. 2d 796, 854 N.W.2d 687 (admission of expert testimony). If the court's decision "has a rational basis and was made in accordance with accepted legal standards in view of the facts," we will affirm. ***Giese***, 356 Wis. 2d 796, ¶16.

¶14 Durski admits the State's expert "was qualified" and "had facts to opine as to what Mr. Durski's blood alcohol level might have been under normal retrograde extrapolation circumstances." He claims, however, that the expert "simply did not have sufficient *facts* to calculate Mr. Durski's blood-alcohol concentration [BAC] at any point in time before the 4:31 a.m. blood draw," "all testimony provided was purely speculative," and "[t]he blood-alcohol result, with no supporting facts tying the information to any driving, would have made it impossible for any other explanation contradicting the evidence seem blatantly unreasonable." While we are unclear as to exactly what Durski is trying to say with this latter point, it appears his overall assertion is that there were insufficient facts from which the State's expert could reliably conclude a blood alcohol level for Durski at the time of driving. We disagree with the point we think Durski is trying to make and we need look no further than our decision in ***Giese***.

¶15 On appeal prior to trial, Giese challenged the expert opinion on retrograde extrapolation on the basis that the opinion was "based upon insufficient facts and data and because the expert relied upon 'unprovable and improper

assumptions' in forming her opinion." *Giese*, 356 Wis. 2d 796, ¶2. Giese founded his challenge upon his position that the extrapolation was "based upon a single blood test at a single point in time." *Id.* We determined that the expert's extrapolation testimony was admissible under WIS. STAT. § 907.02 "because it was the product of reliable principles and methods and based upon sufficient facts and data, which is all that *Daubert* requires." *Giese*, 356 Wis. 2d 796, ¶2. We specifically determined there were "sufficient facts and data" because

> the expert had more to work with here than a single test result. A number of known facts made the expert's assumptions plausible—Giese was found lying in a roadway at 2:12 a.m.; he said he had crashed his vehicle three hours earlier, started walking away from the scene, and fell asleep in the road; there were no bars or restaurants along the route he walked and no alcohol containers found in his car or along that route; and his blood sample drawn an hour or so later had a blood alcohol concentration of .18.

*Id.*, ¶25. We concluded that "the expert had more than just a single test result to work with; she had a scenario from which it was plausible to infer that Giese's alcohol was absorbed before he crashed and that he did not drink after the crash." *Id.*, ¶27. We also noted that due to his prior impaired driving convictions, Giese's prohibited alcohol level was .02, "far below the lowest possible extrapolated value in the expert's calculated range (.221)." *Id.*

¶16 In the case now before us, Durski's BAC level related to the blood sample drawn over three hours after he drove his vehicle was .094. The expert used reverse extrapolation to calculate Durski's BAC level at the time of driving as being "in the range of about" .12 to .17. In making this calculation, the expert was informed of the "scenario" and factored in known facts—such as the time between when Durski drove his vehicle (around 1:13 a.m.) and when his blood was drawn (4:31 a.m.) as well as the fact he is a five-foot-eleven-inch, 200-pound

10

male—and factored in the assumptions that there was "no alcohol consumed after driving and no unabsorbed alcohol" in Durski's blood. The expert calculated that the normal effect two standard alcoholic drinks—consistent with the second story Durski gave the officer at the motel, i.e., that he drank two Bud Lights after arriving at the motel—would have on a male of Durski's size would be to create a BAC level of .03. The expert expressed that if these two drinks had been consumed after driving, "we'd have to subtract that off from each end of the [.12 to .17] range." The expert indicated, based upon the facts of when Durski drove the vehicle and when his blood sample was taken, and assuming that he consumed two drinks after driving, that "the low" for Durski's BAC level at the time of driving would have been "about .09" and the high "about .14." Like Giese, due to prior OWI-related convictions, Durski's prohibited alcohol level was .02, "far below the lowest possible extrapolated value in the expert's calculated range."

¶17    According to the testimony of the investigating officer, Durski first told him at the motel that he had had nothing to drink after arriving there. The officer's further, undisputed, testimony was that despite their best efforts the officers could not locate any Bud Light beer cans in the areas around the motel where Durski claimed to have placed them. These facts provide strong support for the accuracy of the expert's assumption that Durski had consumed all of the alcohol in his system prior to driving. Furthermore, while Durski provided a different story as to when and how much he drank, Patricia Bongiorno and her adult son, who are related to Durski, testified that Bongiorno and Durski had consumed substantial amounts of alcohol—beer and blackberry brandy—for hours together right up until approximately 1 a.m.—right before the family dispute occurred, the police were called, and Durski fled the home.

¶18    Ultimately, whether Durski in fact consumed alcohol after driving, and if so, how much, was for the jury to determine.  Based upon the evidence presented, the jury could easily have concluded that Durski had consumed substantial amounts of alcohol prior to driving and none after.  As in *Giese*, the expert here had more to work with "than just a single test result."  He was informed of the time of driving, the time of the blood draw, and Durski's gender, height, and weight.  He also factored in the plausible assumption that Durski consumed no alcohol after driving.  From this, the expert was able to provide a reliable retrograde extrapolation to calculate the range of Durski's BAC at the time of driving:  .12 to .17.  The expert further calculated and considered the impact of the less plausible assumption that Durski consumed two beers after driving.  As stated, his related extrapolation of .09 to .14 still placed Durski well above the .02 limit that he, like Giese, was afforded based upon his prior record of OWI-related convictions.

¶19    Durski's real grumble in this case appears to be that the jury apparently did not believe his testimony that he "just slammed three beers and couple chugs of the blackberry brandy" between when he would have arrived at

12

the motel and when the investigating officer first made contact with him there.[6] His counsel at trial apparently also did not have much confidence in the likelihood the jury would believe his testimony, in that counsel never asked the State's expert the most obvious of questions—"If Durski had in fact 'slammed three beers' and had a 'couple chugs of the blackberry brandy' after arriving at the motel [shortly after 1:13 a.m.][7] and before the officer made contact with him [around 1:45 to 2 a.m.],[8] how would that affect your calculations as to his BAC level at the time of driving?"

¶20    Durski complains that "pursuant to *his* account, [he] definitively consumed 4-6 alcoholic drinks in significantly under an hour. The retrograde

---

[6] Or, the jury may have believed this but still believed he had consumed enough alcohol prior to driving, such that his BAC level was nonetheless still above .02 when driving. For example, even if the jury believed that Durski consumed four to six alcoholic drinks *after* driving—the best possible position for Durski—it still would not have "saved" him. The expert testified that the effect of "one standard drink" on a male Durski's size "would give a theoretical max affect of .016" BAC. The expert further indicated that if a person had a drink after driving, "we'd have to subtract that off from each end of the range," so here that would have to be subtracted off of the .12 to .17 BAC range the expert opined that Durski had at the time of driving. Although the expert stated that the effect of two standard drinks "is roughly .03," as opposed to .032 (.016 plus .016), using the best possible position for Durski that each drink had a "max affect of .016" and that he consumed six drinks after driving, those six drinks *still* only contributed .096 (six drinks times .016 per drink) of the .12 to .17 BAC level. Using the lowest level of this range, .12, the evidence under the very best possible position for Durski still showed that he would have had approximately .024 (.12 minus .096) BAC in his blood at the time of driving, above his .02 legal limit.

[7] The testimony at trial was that the motel was less than a mile from the house from which Durski had driven.

[8] While the investigating officer testified at the suppression hearing that he made contact with Durski at the motel twenty-five to thirty minutes after he was initially dispatched to the scene, he testified at trial that it was "about 45 minutes."

extrapolation, however, failed to sufficiently reflect this."[9]  (Emphasis added.) There is of course a reason why the expert's extrapolation "failed to sufficiently reflect this," and that is because Durski never asked the expert—who was on the stand and performing calculations about other hypothetical alcohol-consumption questions—what such extrapolation would show if Durski had in fact "consumed 4-6 alcoholic drinks" after driving.  The State's burden at trial was to prove its case, not Durski's, and thus it was not the State's responsibility to ask a hypothetical question about a scenario the State did not believe occurred.  Indeed, Durski's testimony that he "just slammed three beers and couple chugs of the blackberry brandy" when he got to the motel was not even presented until after the State's expert had testified.

¶21     In *Giese*, we approvingly noted the decision of another court that stated "concerns [about the reliability of retrograde extrapolation] relate to the proper weight to be afforded the evidence, not whether the evidence is admissible in the first place."  *Giese*, 356 Wis. 2d 796, ¶28 (citation omitted).  We further added that

> Giese remains free to challenge the accuracy of the expert's assumptions.  He may, for instance, propose competing scenarios—e.g., that Giese drank all the alcohol soon before driving.  Or that he began drinking alcohol, or continued drinking, after the crash.  In our adversary system, "[j]uries resolve factual disputes" like those.  Giese still has the chance to undermine the assumptions that support the expert's opinion by introducing evidence or arguing in favor of competing inferences from the known

---

[9] One of the shortcomings of Durski's brief on appeal is that it is written as if Durski's testimony that he "just slammed three beers and couple chugs of the blackberry brandy" was actually a fact.  There is absolutely no reason whatsoever to conclude the jury believed this testimony.

14

facts. But the expert's opinion is admissible under ***Daubert***.

***Giese***, 356 Wis. 2d 796, ¶28 (citation omitted). The same holds for this case. Durski was free to present all the evidence he could regarding his assertion that he consumed substantial amounts of alcohol after he arrived at the motel. Indeed, he provided his own emphatic testimony to that effect. How much alcohol Durski drank prior to driving and when, and whether he drank alcohol after driving to the motel—and if so, how much—were questions of fact for the jury, questions which the jury apparently did not answer in Durski's favor. He also was free to "challenge the accuracy of the expert's assumptions" and "propose competing scenarios" including his own alleged scenario—that he began drinking after he arrived at the motel and consumed four to six alcoholic drinks in a short amount of time after arriving there—which latter scenario, as we noted, Durski did not present to the expert, despite its obvious potential value. *See **id.***

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)4.