COURT OF APPEALS
DECISION
DATED AND FILED

August 10, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP928**

**STATE OF WISCONSIN**

Cir. Ct. No. **2018TR1088**

**IN COURT OF APPEALS
DISTRICT III**

ST. CROIX COUNTY,

    PLAINTIFF-RESPONDENT,

V.

KELLY M. LAGERSTROM,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for St. Croix County: SCOTT R. NEEDHAM, Judge. *Affirmed*.

¶1    STARK, P.J.[1]  A jury found Kelly Lagerstrom guilty of operating a motor vehicle with a prohibited alcohol concentration (PAC), as a first offense. Lagerstrom appeals, arguing he is entitled to a new trial because the circuit court

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

improperly admitted an expert witness's testimony concerning retrograde extrapolation of Lagerstrom's blood alcohol concentration (BAC). We conclude that pursuant to *State v. Giese*, 2014 WI App 92, 356 Wis. 2d 796, 854 N.W.2d 687, the court did not erroneously exercise its discretion by admitting the retrograde extrapolation testimony. We therefore affirm.

## BACKGROUND

¶2      Lagerstrom was cited for operating a motor vehicle while intoxicated (OWI) and operating with a PAC, both as first offenses, based on conduct that occurred during the early morning hours of February 18, 2018. Lagerstrom entered not-guilty pleas to both citations, and the case proceeded to a jury trial.

¶3      Before trial, Lagerstrom filed a motion seeking to strip an evidentiary chemical test of his blood of its presumptions of reliability and admissibility under WIS. STAT. § 885.235(1g), on the grounds that the blood sample was not taken within three hours of his operation of a motor vehicle. The circuit court granted Lagerstrom's motion and ruled that in order to introduce the blood test result at trial, St. Croix County would be required to establish the test result's probative value through expert testimony, pursuant to § 885.235(3).

¶4      At trial, Kevin Bonte testified that he is a friend of Lagerstrom's brother. In February 2018, Bonte was employed part-time as a bartender at the Pump House, which he testified is the only bar in Downing, Wisconsin, and is located approximately three blocks from Lagerstrom's residence.

¶5      Bonte testified that he worked at the Pump House until its closing time of 2:30 a.m. on February 18, 2018. Sometime thereafter, he received a call from Lagerstrom's son asking for help finding Lagerstrom. Bonte located

Lagerstrom's vehicle in a ditch, but Lagerstrom was not in the vehicle. Bonte looked into the vehicle and did not see any alcohol inside. He and two others then drove around the area looking for Lagerstrom. Bonte estimated that the temperature outside was "close to 20 below." After searching for Lagerstrom for approximately two hours, Bonte and the others decided to call 911. A few minutes later—at about 5:20 or 5:30 a.m.—they heard Lagerstrom yelling for help. Bonte and another man then ran into the woods and found Lagerstrom on the bank of a creek.

¶6 St. Croix County sheriff's deputy Nicholas Krueger testified that he was dispatched at 5:26 a.m. on February 18 to respond to a report of a vehicle in a ditch. When he arrived at the scene, he located the vehicle in the ditch and observed that emergency medical service personnel were tending to the vehicle's driver, whom Krueger identified as Lagerstrom. Krueger observed that Lagerstrom's pants were wet and frozen, and he was missing a shoe. Lagerstrom's exposed skin was red, his lips were blue, and he was shaking.

¶7 Krueger testified that while he was at the scene, Bonte approached him and told him that Lagerstrom had "closed the bar." That statement was documented in Krueger's report. At trial, however, Bonte denied making that statement and testified he instead told Krueger that he—meaning Bonte—had closed down the bar. Bonte also testified that Lagerstrom was not drinking at the Pump House on the night in question. Bonte admitted, however, that he told Krueger during their conversation at the scene that he wanted to remain anonymous.

¶8 Krueger testified that after leaving the scene, he made contact with Lagerstrom at a local hospital. While speaking with Lagerstrom at the hospital,

Krueger noticed the odor of intoxicants and observed that Lagerstrom's eyes were red and "glossy," and his speech was slurred. According to Krueger, Lagerstrom admitted drinking "[a]t the bar" before driving into the ditch. He denied consuming any alcohol after leaving the bar, while driving, or after he drove into the ditch. He told Krueger that he left his vehicle after driving into the ditch because he did not want to be arrested for OWI.

¶9 Lagerstrom testified that he did not remember much between the afternoon of February 17, 2018, and waking up in the hospital the next day. However, he did remember consuming alcohol at his parents' home in Boyceville, Wisconsin, during the early afternoon of February 17. He testified he then had dinner and drinks with his parents at a bar in Boyceville at around 3:00 or 4:00 p.m., but he did not remember anything that occurred thereafter. He did not believe that he was intoxicated after dinner, but he could not explain why he did not remember anything that happened after that point.

¶10 Medical technologist Karen Littlefield testified that she drew a sample of Lagerstrom's blood at the request of law enforcement at 8:00 a.m. on February 18, 2018. The County then sought to introduce the testimony of Lorrine Edwards, an advanced chemist in the forensic toxicology section of the Wisconsin Laboratory of Hygiene, regarding the result of the blood test and her use of retrograde extrapolation to determine what Lagerstrom's BAC would have been at the time he operated his vehicle. The County provided an offer of proof and argued that Edwards' testimony was admissible under *Giese*. In response, Lagerstrom argued *Giese* was distinguishable because, unlike in that case, there was no clear evidence as to the time that Lagerstrom operated his vehicle, and "we can't extrapolate back to a speculated time of driving."

¶11    The circuit court concluded that Edwards' proffered testimony was admissible under *Giese* and that Lagerstrom's objections to her testimony went to its weight, rather than its admissibility. The court also noted that Lagerstrom would have the opportunity to test the assumptions on which Edwards' testimony was based during cross-examination.

¶12    During Edwards' subsequent testimony, Lagerstrom stipulated to her qualifications as an expert. Edwards then testified that Lagerstrom's blood sample revealed a BAC of 0.152 at the time of his 8:00 a.m. blood draw. She explained that, based on that test result, she used retrograde extrapolation to estimate what Lagerstrom's BAC would have been at various times before his blood draw.

¶13    In support of her retrograde extrapolation testimony, Edwards testified that she has been trained in "how alcohol is metabolized in the blood, how it can be eliminated over time, [and] how such factors as food, gender, size, weight, [and] fat content on the body can affect the concentration per drink." She also explained that retrograde extrapolation is based on "scientific mathematical models that have been established over … 34 years of research," some of which she had personally conducted.

¶14    Based on that research, Edwards explained that the recognized "average rate of elimination or metabolism" of alcohol is 0.015 grams per 100 milliliters per hour. She explained that average rate can be used to calculate what an individual's BAC would have been at an earlier point in time. She testified, however, that when she performs a retrograde extrapolation, she prefers to use both slow and fast "metabolizer" rates, which produces a range of BACs for a particular time. Using that process, Edwards concluded that Lagerstrom's BAC

would have been between 0.19 and 0.25 at 4:00 a.m., between 0.20 and 0.28 at 3:00 a.m., and between 0.21 and 0.31 at 2:00 a.m.

¶15     Edwards conceded that her calculations rested on the assumption that there was no unabsorbed alcohol in Lagerstrom's stomach. She also agreed that retrograde extrapolation "doesn't work" if the individual was actively drinking between the time of the alleged offense and the blood draw. In addition, Edwards admitted that she could not testify as to what Lagerstrom's BAC was at the time he drove his vehicle because she did not know what time the driving had occurred.

¶16     After the County rested its case, Lagerstrom moved for a directed verdict on the grounds that the County had failed to establish a time of driving, and the jury therefore could not conclude whether Lagerstrom was under the influence or had a PAC at that time. The circuit court denied Lagerstrom's motion. However, it subsequently granted his request to instruct the jury as follows regarding the relevance of the blood test result:

> If you accept Kevin Bonte's testimony given in court today that Kelly Lagerstrom was not at the bar and did not close down the bar, then you may not consider the blood test result, as it would be irrelevant without proof of when Mr. Lagerstrom last operated a motor vehicle.
>
> If you accept Deputy Krueger's testimony given in court today that Kevin Bonte told the deputy that Mr. Lagerstrom closed down the bar, then you may give the test result the weight you determine it is entitled to receive in the light of all of the evidence received during this trial.

¶17     The jury found Lagerstrom guilty of the PAC charge, but not guilty of the OWI charge. Lagerstrom then filed a postverdict motion seeking three alternative forms of relief: (1) judgment notwithstanding the verdict; (2) a change

in the jury's answer on the PAC verdict; or (3) reconsideration of the circuit court's denial of his motion for a directed verdict. In support of his motion, Lagerstrom argued, in part, that the court had improperly admitted his blood test result because Edwards' testimony "was not based upon sufficient facts or data as required under WIS. STAT. § 907.02(1)."

¶18    The circuit court denied Lagerstrom's postverdict motion in a written decision and order, concluding that the motion merely rehashed arguments the court had already rejected. Lagerstrom now appeals, arguing that the court erred by admitting Edwards' retrograde extrapolation testimony.[2]

**DISCUSSION**

¶19    We review a circuit court's decision to admit or exclude expert testimony under the erroneous exercise of discretion standard. *Giese*, 356 Wis. 2d

---

[2] Lagerstrom's notice of appeal states that he is appealing from the entirety of a judgment or order entered by the Honorable Scott R. Needham on May 14, 2019. Judge Needham presided over Lagerstrom's jury trial, imposed sentence, and entered the order denying his postverdict motion. However, no judgment or order dated May 14, 2019, exists in the appellate record.

Lagerstrom's appellate briefs state that he is appealing a "judgment of conviction entered in the St. Croix County Circuit Court, the Hon. Michael R. Waterman presiding," presumably referring to Judge R. Michael Waterman. (Formatting altered.) The County's brief, in turn, states that this is an appeal from "a judgment of conviction entered in the St. Croix County Circuit Court, Branch III, the Honorable Scott R. Needham presiding." (Formatting altered.) While the record contains an April 26, 2019 order denying Lagerstrom's postverdict motion, which states that it is a final order for purposes of appeal, the record does not contain any written judgment. Moreover, it does not appear that Judge Waterman presided over any portion of this case.

We construe this appeal as an appeal from both the civil forfeiture judgment that adjudged Lagerstrom guilty of operating with a PAC and from the order denying Lagerstrom's postverdict motion, to the extent that order reaffirmed the court's decision regarding the admissibility of Edwards' testimony. Although the appellate record does not contain a copy of the civil forfeiture judgment, neither Lagerstrom nor the County has raised any concern regarding its absence, and we therefore do not address the issue further.

796, ¶16. As such, we will not reverse as long as there was a rational basis for the court's decision and it was made in accordance with the accepted legal standards and the facts of record. ***Id.***

¶20    The admissibility of chemical tests for intoxication is governed by WIS. STAT. § 885.235. *See **Giese***, 356 Wis. 2d 796, ¶16. That statute provides, in relevant part, that in any proceeding in which it is material to prove that a person had a PAC, evidence of the amount of alcohol in the person's blood at the time in question, as shown by chemical analysis of a sample of the person's blood, "is admissible on the issue of whether he or she … had a [PAC] … if the sample was taken within 3 hours after the event to be proved." Sec. 885.235(1g). In addition, if a sample taken within three hours of the event to be proved shows that the person had an alcohol concentration of 0.08 or more, it constitutes "prima facie evidence … that [the person] had an alcohol concentration of 0.08 or more." Sec. 885.235(1g)(c). If, however, the sample was not taken within three hours of the event to be proved, "evidence of the amount of alcohol in the person's blood … as shown by the chemical analysis is admissible only if expert testimony establishes its probative value and may be given prima facie effect only if the effect is established by expert testimony." Sec. 885.235(3).

¶21    The admissibility of expert testimony, in turn, is governed by WIS. STAT. § 907.02(1), which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

¶22    Here, it is undisputed that Lagerstrom's blood sample was taken over three hours after the last possible time that he could have operated his vehicle. As such, the circuit court granted Lagerstrom's motion to strip the test result of its presumptions of admissibility and reliability under WIS. STAT. § 885.235(1g). Based on *Giese*, however, the court determined that Edwards' expert testimony regarding the blood test result and her use of retrograde extrapolation to estimate Lagerstrom's BAC at various earlier times was admissible under WIS. STAT. §§ 885.235(3) and 907.02(1). The court properly exercised its discretion in that regard.

¶23    A summary of *Giese*'s facts and holding is instructive. Giese was found lying in a road in the early morning and appeared to be intoxicated. *Giese*, 356 Wis. 2d 796, ¶3. He told a responding officer that he had crashed his vehicle "about three hours earlier," he began to walk home, and he then fell asleep in the road. *Id.*, ¶4. Giese admitted that he had been at a tavern with friends sometime before the crash, but he could not remember any details. *Id.* The crash scene was located about three miles east of where Giese was ultimately found. *Id.*, ¶5. Police did not find any alcohol inside of Giese's vehicle. *See id.*, ¶¶5, 25.

¶24    Giese was transported to a medical center, where a sample of his blood was drawn. *Id.*, ¶6. Later analysis of the sample showed a BAC of 0.181. *Id.* It was undisputed that the blood test result was not automatically admissible under WIS. STAT. § 885.235(1g) because it had not been taken within three hours of the time that the crash occurred. *Giese*, 356 Wis. 2d 796, ¶9. However, the State sought to introduce expert testimony regarding the result of the blood test and the use of retrograde extrapolation to determine, based on that result, what Giese's BAC would have been at the time of the crash. *Id.*, ¶¶11-12.

¶25    The circuit court held a hearing on the admissibility of the retrograde extrapolation evidence, during which the toxicologist who had analyzed Giese's blood sample testified as to her educational background, experience, and training, which included training regarding the "effect of alcohol dissipation and elimination." *Id.*, ¶11.    The toxicologist testified that she had performed retrograde extrapolation in other cases and was familiar with books and studies on that topic and "the rates of alcohol absorption and elimination generally accepted in her peer community of forensic toxicologists." *Id.*  She also testified "as to the established average, fast, and slow rates of elimination and explained how those rates were the foundation for her calculation of a range of possible blood alcohol concentration levels for Giese at the time of his crash." *Id.*

¶26    The toxicologist explained that, for purposes of her retrograde extrapolation analysis, she had been informed that Giese's crash occurred between four hours and four and one-half hours before the blood draw. *Id.*, ¶12.  She also testified that her calculations assumed that the alcohol Giese had consumed "was fully absorbed before the incident and no additional alcohol was ingested afterwards." *Id.*  Based on those assumptions, the toxicologist testified to a reasonable degree of scientific certainty that Giese's BAC was above the applicable limit at the time of the crash. *Id.*  However, she conceded on cross-examination that changes to her underlying assumptions could change her opinion as to Giese's BAC. *Id.*  For instance, she admitted that her calculations would change if the facts established that there was unabsorbed alcohol in Giese's stomach at the time of the crash. *Id.*

¶27    Giese argued the toxicologist's testimony was inadmissible because it was "based upon assumptions" concerning the time of driving, the time of drinking, and the fact that no drinking had occurred between the crash and the

blood test. *Id.*, ¶¶9-10. Giese also relied on the testimony of his own expert witness, and cases from other jurisdictions, to argue that retrograde extrapolation cannot be performed reliably based on a single blood test result. *Id.*, ¶¶10, 24.

¶28 The circuit court concluded the toxicologist's retrograde extrapolation testimony was admissible under WIS. STAT. § 907.02(1), and we affirmed that determination on appeal. *Giese*, 356 Wis. 2d 796, ¶¶15, 25. We reasoned that retrograde extrapolation "is a widely accepted methodology in the forensic toxicology field," and "[t]he mere fact that some experts may disagree about the reliability of retrograde extrapolation does not mean that testimony about retrograde extrapolation violates the *Daubert* standard."[3] *Giese*, 356 Wis. 2d 796, ¶23. We concluded the toxicologist's testimony was the product of reliable principles and methods and was based upon sufficient facts and data, "which is all that *Daubert* requires." *Giese*, 356 Wis. 2d 796, ¶2. We also rejected Giese's argument that the toxicologist's testimony was unreliable because it was based on only a single blood test, reasoning that the toxicologist "had more than just a single test result to work with; she had a scenario from which it was plausible to infer that Giese's alcohol was absorbed before he crashed and that he did not drink after the crash." *Id.*, ¶27.

¶29 Ultimately, we concluded that Giese's objections went to the weight of the toxicologist's opinions and the validity of her underlying assumptions, rather than to the admissibility of her testimony. *Id.*, ¶¶2, 28. We explained that Giese was free to challenge the accuracy of the toxicologist's assumptions at trial

---

[3] WISCONSIN STAT. § 907.02 was amended in in 2001 to adopt the federal standard for admissibility of expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Seifert v. Balink*, 2017 WI 2, ¶6, 372 Wis. 2d 525, 888 N.W.2d 816.

by "introducing evidence or arguing in favor of competing inferences from the known facts." *Id.*, ¶28. We emphasized that "[t]he accuracy of the facts upon which the expert relies and the ultimate determinations of credibility and accuracy are for the jury, not the court." *Id.*, ¶23.

¶30 Based on *Giese*, the circuit court in this case properly exercised its discretion by determining that Edwards' retrograde extrapolation testimony was admissible under WIS. STAT. § 907.02(1). Lagerstrom argues that *Giese* is distinguishable because the blood draw in that case "was not done outside of the 3-hour window listed in WIS. STAT. § 885.235(3)." Lagerstrom is mistaken, however, as it was undisputed in *Giese* that the blood draw occurred more than three hours after the alleged driving and that the test result was therefore inadmissible unless supported by expert testimony. *See Giese*, 356 Wis. 2d 796, ¶¶9, 12.

¶31 Lagerstrom also argues that *Giese* is distinguishable because the police in that case "knew the time of offense," but here the County failed to establish "the exact time" when Lagerstrom operated his vehicle. Lagerstrom overstates the specificity regarding the evidence of the time of the offense in *Giese*. As noted above, after Giese was found lying in a road, he told an officer that he had crashed his vehicle "about three hours earlier." *Id.*, ¶¶3-4. He was subsequently taken to a medical center, and his blood was drawn at 3:30 a.m. *Id.*, ¶6. The toxicologist assumed for purposes of her analysis that the crash had occurred between four hours and four and one-half hours before the blood draw. *Id.*, ¶12. She did not, however, know precisely when the crash took place.

¶32 Here, although Lagerstrom is correct that there is no evidence as to the "exact time" he drove his vehicle, there was sufficient evidence to support a

12

reasonable inference that the driving occurred sometime between 2:30 a.m. and 3:30 a.m. Bonte testified that he worked at the Pump House until its closing time of 2:30 a.m. on the night in question. Krueger testified that during their conversation at the accident scene, Bonte told him Lagerstrom had "closed the bar" that night. Although Bonte later denied making that statement during his trial testimony, the factual discrepancy as to whether Bonte told Krueger that Lagerstrom had "closed the bar" that night was for the jury to resolve.[4] If the jurors accepted Krueger's testimony about Bonte's statement that Lagerstrom "closed the bar," they could have reasonably inferred that Lagerstrom operated his vehicle sometime after 2:30 a.m. on the night in question.

¶33 There was also evidence at trial from which the jury could reasonably conclude that the "time of driving" window ended at 3:30 a.m. Bonte testified that after finding Lagerstrom's vehicle in the ditch, he searched for Lagerstrom for approximately two hours before hearing him yelling at about 5:20 or 5:30 a.m. Based on that testimony, the jury could reasonably conclude that

---

[4] There was a sufficient basis in the trial record for the jury to reject Bonte's trial testimony that Lagerstrom was not drinking at the Pump House on the night in question and did not close down the bar. Bonte conceded at trial that when he spoke to Krueger that night, he asked to remain anonymous. We agree with the County that it "defies logic" that Bonte "would save Lagerstrom from hypothermia, say nothing incriminating about Lagerstrom, but then ask the deputy to remain anonymous." As the County aptly notes, it makes more sense that Bonte, "a family friend of Lagerstrom, would want to remain anonymous after telling the deputy that Lagerstrom was drinking at a bar until 2:30 a.m."

In addition, we agree with the County that other circumstantial evidence supported a conclusion that Lagerstrom was drinking at the Pump House on the night in question. Krueger testified that during his interview with Lagerstrom at the hospital, Lagerstrom stated he was drinking "[a]t the bar" before he drove into the ditch. Other evidence established that the Pump House was the only bar in Downing, Wisconsin, and was about three blocks from Lagerstrom's residence. These facts further supported a reasonable inference that, contrary to Bonte's trial testimony, Lagerstrom was drinking at the Pump House and closed down that establishment at 2:30 a.m. before driving his vehicle into the ditch.

Bonte found Lagerstrom's vehicle in the ditch at about 3:30 a.m. And, it could therefore reasonably conclude that Lagerstrom drove his vehicle into the ditch sometime between 2:30 a.m., when he left the Pump House, and 3:30 a.m., when Bonte found his vehicle. Edwards testified that at 3:00 a.m., during the middle of that time frame, Lagerstrom's BAC would have been between 0.20 and 0.28. She also testified that Lagerstrom's BAC would have been above the legal limit of 0.08 both at 2:00 a.m. and 4:00 a.m.

¶34 Lagerstrom also questions Edwards' assumptions that there was no unabsorbed alcohol in his stomach at the time of driving and that he did not consume any additional alcohol after driving his vehicle into the ditch. Based on the evidence, however, those assumptions were not unreasonable. Bonte testified that he did not see any alcohol when he looked inside Lagerstrom's vehicle. There was no evidence to indicate that Lagerstrom consumed any alcohol between the time he left his vehicle in the ditch and the time he was found. To the contrary, Krueger testified Lagerstrom expressly stated that he was drinking "[a]t the bar" before driving into the ditch, and that he did not consume any alcohol after leaving the bar, while driving, or after driving into the ditch. In addition, Edwards testified that a person generally absorbs eighty percent of the alcohol he or she consumes within thirty minutes of consumption. On these facts, it was reasonable to assume that there was no unabsorbed alcohol in Lagerstrom's stomach at the time of driving and that he did not consume any additional alcohol thereafter.

¶35 The facts and assumptions that Edwards relied upon in her retrograde extrapolation analysis were similar to those relied upon by the expert witness in *Giese*. In *Giese*, as in this case, the exact time of driving could not be established, nor was there ironclad evidence showing that there was no unabsorbed alcohol in the defendant's stomach at the time of driving or that the defendant had

not consumed alcohol after driving. Nevertheless, the *Giese* court concluded that because there was evidence supporting the expert witness's assumptions on those points, her testimony was the product of reliable principles and methods and was based on sufficient facts and data. *See Giese*, 356 Wis. 2d 796, ¶¶2, 25, 27. Based on the similarities between this case and *Giese*, the circuit court properly exercised its discretion by determining that the same was true here. And, like the *Giese* court, the circuit court reasonably concluded that Lagerstrom's objections to Edwards' retrograde extrapolation testimony went to its weight, rather than its admissibility, and that Lagerstrom was free to challenge the validity of Edwards' assumptions at trial. *See id.*, ¶¶2, 28. *Giese* also defeats Lagerstrom's argument that the retrograde extrapolation testimony in this case was inadmissible because it was based on only one blood test, rather than two tests that were performed at different times. *See id.*, ¶¶24-27.

¶36 Finally, Lagerstrom argues that even if we conclude the circuit court properly determined that the retrograde extrapolation evidence was admissible under WIS. STAT. § 907.02(1), we should nevertheless conclude that the evidence was improperly admitted because its probative value was outweighed by the danger of unfair prejudice. *See* WIS. STAT. § 904.03. We reject this argument for two reasons. First, Lagerstrom does not cite any portion of the appellate record showing that he objected to the retrograde extrapolation testimony on this basis in the circuit court, and we have not located any such objection in the record. Arguments raised for the first time on appeal are generally deemed forfeited. *Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810.

¶37 Second, Lagerstrom's argument that the retrograde extrapolation evidence should have been excluded under WIS. STAT. § 904.03 rests entirely on the same contentions that he raised to support his argument that the evidence was

improperly admitted under WIS. STAT. § 907.02(1). Specifically, he argues the evidence was "far more prejudicial than probative" because the jury merely heard "estimates based on multiple assumptions rather than scientific evidence based on known facts." We have already rejected that contention, for all of the reasons explained above. Lagerstrom's attempt to repackage his argument that the evidence was improperly admitted under § 907.02(1) as an argument that the evidence should have been excluded under § 904.03 therefore fails.[5]

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[5] In his reply brief, Lagerstrom argues the County conceded that the admission of the retrograde extrapolation evidence was "more prejudicial than probative" by failing to respond to that argument in its respondent's brief. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments may be deemed conceded). We disagree. As explained above, Lagerstrom's argument that the evidence should have been excluded under WIS. STAT. § 904.03 was based on the same underlying contentions as his claim that the evidence was inadmissible under WIS. STAT. § 907.02(1). The County responded to those contentions in the context of its argument that the evidence was properly admitted under § 907.02(1). Under these circumstances, we do not deem the County to have conceded that the evidence should have been excluded under § 904.03. In any event, we are not required to accept a litigant's concession of law. *State v. Carter*, 2010 WI 77, ¶50, 327 Wis. 2d 1, 785 N.W.2d 516.