COURT OF APPEALS
DECISION
DATED AND FILED

February 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1741-CR**

Cir. Ct. No. **2019CF239**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

BRION LAMAR HATCHER,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Brown County: TAMMY JO HOCK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Brion Lamar Hatcher appeals a judgment convicting him of three crimes, including first-degree intentional homicide while

using a dangerous weapon, and an order denying his motion for postconviction relief. On appeal, he argues that he is entitled to a new trial because the State failed to provide the defense with certain impeachment evidence and the circuit court erred by permitting a witness to identify him at trial. He also argues that the court erred by denying his ineffective assistance of trial counsel claim without a hearing and that his case should be dismissed with prejudice because his constitutional right to a speedy trial was violated. For the reasons that follow, we reject Hatcher's arguments and affirm.

## BACKGROUND

¶2    In February 2019, the State charged Hatcher with first-degree intentional homicide while using a dangerous weapon, possession of a firearm by a felon, and misdemeanor bail jumping. The charges stemmed from allegations that Hatcher shot and killed Tavarious Edwards at Edwards' residence on January 27, 2019.

¶3    After several delays, Hatcher's case proceeded to a jury trial in May 2021. Edwards' girlfriend, Amanda,[1] testified that on January 27, 2019, Edwards was cooking dinner in the kitchen of their residence when someone knocked on their front door. Edwards answered the door, and a man entered. Amanda stated that she observed the man for several seconds but did not recognize him as someone she knew. Amanda testified that the person who entered the residence with Edwards was taller than six feet, stocky, and had dark skin. She stated that

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use a pseudonym to refer to Edwards' girlfriend. *See also* WIS. STAT. § 950.02(4)(a)4. (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

the man and Edwards went into the basement. Approximately ten or fifteen minutes later, Amanda heard a "bang" and "thought something had fell." Amanda called 911 after discovering that the back door of the residence was open and that Edwards was lying "on the ground" in the basement with "blood everywhere." A medical examiner testified that Edwards died of a gunshot wound to the neck.

¶4    Amanda further testified that law enforcement conducted two photo arrays with her. With respect to the first photo array, conducted the night of Edwards' murder, Amanda testified that she selected one individual from the photographs who she thought had entered the residence with Edwards. Amanda confirmed that she told the detective conducting the photo array that her confidence level in her selection was a "5" out of "10." With respect to the second photo array, conducted two days after Edwards' murder, Amanda stated that she chose two individuals from the photographs who "looked similar to" the person she saw enter her residence, but she told detectives that she was "[n]ot very confident" and that her confidence level in her selection was a "6" or "7" out of "10." Amanda testified that at the time of the trial she could not remember either of the two individuals she picked out from the photo array.

¶5    At trial, Amanda identified Hatcher as the person who entered her residence with Edwards, stating that she first knew it was him when she observed him on an audiovisual feed at his first court hearing in this case. Amanda conceded on cross-examination, however, that she had seen Hatcher's photograph in the news prior to the first court hearing.

¶6    Detective Craig Pakkala testified that he assisted with the first photo array shown to Amanda. Craig Pakkala stated that Hatcher's photograph was not included in the array and that Amanda had selected one individual who she

thought may have entered her residence with Edwards. Detective Cassandra Pakkala testified that she assisted with the second photo array shown to Amanda. Cassandra Pakkala stated that Amanda selected two individuals from the photo array, one being Hatcher. The second photo array was admitted into evidence.

¶7 The State also presented evidence that Hatcher told another individual, either on January 24 or 25, 2019, that Edwards had robbed him of $1,000 "the night before." That individual testified that Hatcher threatened her to inform Hatcher of where Edwards lived. The State introduced evidence that the individual had sent a text message to Hatcher with Edwards' address on the day of the murder along with a message that read, "I got who u want." Another witness testified that Hatcher had told her that someone stole $1,000 from him.

¶8 The evidence at trial further showed that Hatcher and Edwards were at a bar on the night of January 26, 2019. Edwards' friend testified that he was with Edwards at the bar and, at some point that evening, observed Hatcher and three others in the bathroom of the bar "searching or going in [Edwards'] pockets." Later that evening, the friend saw Hatcher and Edwards get into an argument during which Hatcher "ball[ed] up his fists" and "g[ot] all into [Edwards'] face."

¶9 Detective Brad Biller viewed the bar's surveillance camera footage from that night and confirmed that there were two altercations between Hatcher and Edwards. He testified that on the first occasion, Hatcher was "right up in" Edwards' "face and then [he] eventually grabb[ed]" Edwards "by the arm and" led "him off camera" toward the bathroom. On the second occasion, Hatcher went "around the bar" and "grab[bed]" Edwards' "arm and violently grip[ped] it

4

toward[] him." Biller stated that his perception of Hatcher in the footage was that he was "very agitated with" Edwards.

¶10 The State also introduced evidence regarding Hatcher's general location at time of Edwards' death using cellphone data. A Green Bay Police Department crime analyst, Melissa Warych, testified that the cellphone data was obtained from Verizon and depicted which cellphone towers Hatcher's cellphone was communicating with at certain times on January 27, 2019. Warych stated that the cellphone data did not attempt to definitively state the location of a cellphone or individual, but Warych explained that it is "typical for a mobile device to communicate with the closest tower to that device." Warych stated that which tower a cellphone communicates with depends on a variety of factors, including the distance from the cellphone to the tower, topography, the height of surrounding buildings, and how busy an area is at that moment. Warych stated that there is no way to tell from the type of cellphone data obtained from Verizon whether a cellphone is connecting with the closest cellphone tower or with another tower close by.

¶11 Warych testified that she plotted the cellphone data from Verizon using a program called GeoTime, and the State introduced the resulting map into evidence at trial. Warych testified that each cellphone tower has three "sectors" and that GeoTime uses the "FBI standard of 1.5 miles to give for" each sector. However, Warych stated that the sectors were not exact and were more of a "visual representation."

¶12 Warych testified that the GeoTime mapping showed which sector of the tower was used when it communicated with Hatcher's cellphone. Warych stated that the cellphone data demonstrated that Hatcher's cellphone was

5

communicating with a tower near Edwards' address around the time of Edwards' murder. The cellphone data further showed that Hatcher's cellphone was communicating with cellphone towers in Green Bay around the time of Edwards' murder, south of Green Bay approximately less than one hour after the murder, and in Milwaukee approximately two and one-half hours after the murder. According to the State at trial, this evidence contradicted Hatcher's statement to detectives that he had left for Milwaukee hours before the homicide and instead showed that Hatcher fled for Milwaukee right after killing Edwards.

¶13 In addition, the State presented video surveillance collected from several businesses that were near Edwards' residence or were on the route between Hatcher's residence and Edwards' residence on the date of Edwards' death. Videos and photographs from surveillance cameras depict an individual driving a silver Audi matching a description of Hatcher's vehicle[2] to and from Edwards' residence around his estimated time of death. One of these videos depicted an individual in a silver Audi parking near Edwards' residence. Although the video was of low quality, the State asserted that it showed an individual parking, turning off the vehicle or the lights, and entering Edwards' residence. Minutes later, it appears that the individual leaves the residence, enters the silver Audi, and drives away. Shortly thereafter, a separate security camera showed the individual leaving the area of Edwards' residence in the silver Audi. Four minutes after that security camera captured the described movement of the individual in the silver Audi,

---

[2] A detective testified that he was looking to match certain characteristics from Hatcher's vehicle to the vehicle depicted in the surveillance footage. These characteristics included no front license plate, five-spoke rims, distinctive headlights, and a sunroof. Law enforcement were also able to corroborate some of Hatcher's earlier movements on January 27, 2019, which showed that he was driving a vehicle matching the silver Audi depicted in the later security camera footage near Edwards' residence around the time Edwards was killed.

another security camera captured the individual driving the silver Audi toward Hatcher's residence.

¶14    Another of the State's witnesses was G.T., Hatcher's cellmate at the Green Bay Correctional Institution from October 2020 until January 2021.  G.T. testified that while he and Hatcher were cellmates, Hatcher admitted to killing Edwards because he stole $1,000 from Hatcher and "disrespected" him at a bar. G.T. stated that he was "coming forward" with this information because he wanted "[t]o do the right thing" and "hop[ed] for consideration."  G.T. clarified that by "consideration" he meant a reduction of a sentence that he was then serving.  G.T. also acknowledged that he had a postconviction hearing the following month. However, G.T. testified that he had not been promised anything by the State for his testimony, that he had reached out to law enforcement following Hatcher's statement, and that testifying as a State witness created "some risk" for him in prison.  On cross-examination, G.T. acknowledged that inmates at the prison often kept legal documents in their cells, but he stated that each inmate received a locker with a combination lock on it.  G.T. conceded that he had access to local television channels but denied observing coverage of Hatcher's case.

¶15    The jury found Hatcher guilty on all three counts charged. Following sentencing, Hatcher filed a motion for postconviction relief requesting a new trial.  Hatcher alleged that in June 2022, the State disclosed to him that in March 2021, and prior to Hatcher's trial, the Milwaukee Police Department had conducted an investigation regarding G.T. resulting in two police reports.  The reports outlined that G.T. asked another inmate to provide false information in support of G.T.'s postconviction motion via an affidavit that G.T. drafted and had the other inmate sign.  The affidavit claimed that the other inmate was a witness to the events underlying G.T.'s conviction and that G.T. was not the perpetrator in

that case. Hatcher argued that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to previously disclose evidence of G.T.'s actions obtained through the investigation. In addition, Hatcher argued that his trial counsel was ineffective by failing to "investigate the reliability of historical cell cite location" and the GeoTime mapping used at trial and failing to sufficiently challenge the State's reliance on that evidence.

¶16     The circuit court denied Hatcher's motion for postconviction relief without holding a hearing. Hatcher now appeals, challenging the court's decision to permit Amanda to identify him at trial and its decision denying his motion for postconviction relief. Hatcher also contends that his case should be dismissed with prejudice because his constitutional right to a speedy trial was violated. For the reasons that follow, we reject his arguments and affirm.

## DISCUSSION

### I. *Brady* violation

¶17     "A defendant has a due process right to any favorable evidence 'material either to guilt or to punishment' that is in the State's possession, including any evidence which may impeach one of the State's witnesses." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468 (quoting *Brady*, 373 U.S. at 87). "A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material." *Wayerski*, 385 Wis. 2d 344, ¶35. "We independently review whether a due process violation has occurred, but we accept the [circuit] court's findings of historical fact unless

clearly erroneous." ***State v. Lock***, 2012 WI App 99, ¶94, 344 Wis. 2d 166, 823 N.W.2d 378.

¶18 We need not address the first two prongs of the ***Brady*** analysis because we conclude, as did the circuit court, that evidence of G.T.'s actions obtained through law enforcement's investigation was not material. Hatcher argues that evidence of G.T.'s actions, as described in the police reports, was material because it could have further impeached G.T. by providing the jury with additional reasons to find his testimony incredible. According to Hatcher, "[w]ithout the suppressed evidence, [he] could only speculate and argue about G.T.'s motives: the police reports substantiate the speculative arguments." Further, Hatcher contends that the evidence against him was not "overwhelming." He argues that "the only question in this case" was the identity of Edwards' killer and that the State's case against Hatcher did not include DNA evidence or "independent witnesses."

¶19 "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ***Wayerski***, 385 Wis. 2d 344, ¶61 (citation omitted). This standard "is the same as the prejudice prong of the" ***Strickland***[3] analysis. ***Wayerski***, 385 Wis. 2d 344, ¶36. "Impeachment evidence is not material, and thus a new trial is not required[,] 'when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" ***State v. Rockette***, 2006 WI App 103, ¶41, 294 Wis. 2d 611, 718 N.W.2d 269 (citations omitted). "Evidence of

---

[3] *See* ***Strickland v. Washington***, 466 U.S. 668 (1984).

impeachment is material if the witness whose testimony is attacked 'supplied the only evidence linking the defendant(s) to the crime,' or 'where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.'" ***Id.*** (citations omitted); *see also **United States v. Agurs***, 427 U.S. 97, 112-14 & n.21 (1976).

¶20  Hatcher's trial counsel thoroughly cross-examined G.T. on his motivations for providing testimony for the State.  G.T., who informed the jury that he had five prior convictions, stated that he was testifying, in part, because he wanted to receive a reduced sentence.  The circuit court instructed the jury to determine witness credibility using several factors, including the witness's interest in the result of the trial and his or her possible motives for falsifying testimony. *See* WIS JI—CRIMINAL 300 (2023).  In his closing argument, Hatcher's trial counsel discussed the serendipitous timing of G.T's testimony regarding Hatcher's supposed confession, noting that G.T.'s postconviction hearing was weeks away. Likewise, counsel discussed G.T.'s motivations for falsifying his testimony, stating that G.T. "wants to get out early and wants to get as much leverage as he can to negotiate" his release.  Accordingly, while evidence of G.T.'s actions described in the police reports may have provided an additional basis on which to find G.T's testimony incredible, his credibility was certainly already in question at trial.

¶21  Moreover, the State did not rely exclusively on G.T.'s testimony to establish Hatcher's guilt at trial, and further attacks on G.T.'s credibility would not have undermined the State's case.  Other witnesses testified that Hatcher was upset with Edwards because Edwards allegedly stole Hatcher's money, and one of those witnesses sent a text message to Hatcher with Edwards' address on the day of the murder.  *See **Kelly v. State***, 75 Wis. 2d 303, 320 n.7, 249 N.W.2d 800

(1977) ("[M]otive may be shown as a circumstance to aid in establishing the guilt of a defendant."). Additionally, witness testimony showed that Hatcher had two altercations with Edwards at a bar the night before the murder. This evidence was corroborated by the bar's security camera footage. In other words, there was other, significant, evidence of Hatcher's motive.

¶22 Furthermore, Hatcher's cellphone communicated with a tower near Edwards' residence around the time of the murder. Hatcher argues that the cellphone data was not "damning" evidence because he "lived in the same area as the victim." Be that as it may, the cellphone data, at a minimum, contradicted Hatcher's statement to detectives that he had left for Milwaukee hours before the murder. The cellphone data also indicated that Hatcher fled to Milwaukee immediately following the murder.

¶23 The State also presented evidence through the security camera footage from businesses showing an individual driving a silver Audi to and away from Edwards' residence around the time of the murder. The silver Audi had the same unique characteristics as Hatcher's vehicle, and the security camera footage provided a strong indication that Hatcher was at Edwards' residence when Edwards was killed.

¶24 In short, there is not a reasonable probability that had the evidence of G.T.'s actions described in the police reports been disclosed to Hatcher prior to trial, the result of the proceeding would have been different. The jury heard evidence questioning G.T.'s credibility, and the State's case against Hatcher, even excluding G.T.'s testimony, was strong. We reject Hatcher's **Brady** claim on these bases.

**II. Ineffective assistance of counsel**

¶25 Hatcher argues that the circuit court erred by denying his motion for postconviction relief based on ineffective assistance of counsel without a hearing. More precisely, Hatcher argues that he sufficiently alleged in his motion that his counsel failed to adequately investigate the cellphone data—thereby preventing a more effective cross-examination of Warych—or, alternatively, failed to file a motion to exclude Warych's testimony under *Daubert*.[4]

¶26 In order to obtain a hearing on a postconviction motion, a defendant must allege sufficient material facts—e.g., who, what, where, when, why, and how—to warrant the relief sought. *State v. Allen*, 2004 WI 106, ¶¶9, 36, 274 Wis. 2d 568, 682 N.W.2d 433. To demonstrate that counsel was ineffective, a defendant must prove both that counsel's performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶27 "To establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (citation omitted). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A defendant who alleges a failure to investigate on the part of his or her counsel "must base a challenge to counsel's representation on more than

---

[4] *See* ***Daubert v. v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993). WISCONSIN STAT. § 907.02 has been amended "to make Wisconsin law on the admissibility of expert testimony consistent with 'the *Daubert* reliability standard.'" *State v. Giese*, 2014 WI App 92, ¶17, 356 Wis. 2d 796, 854 N.W.2d 687 (citation omitted).

speculation." ***State v. Leighton***, 2000 WI App 156, ¶38, 237 Wis. 2d 709, 616 N.W.2d 126. The defendant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the case." ***Id.***

¶28 "Whether a defendant's postconviction motion alleges sufficient facts to entitle the defendant to a hearing for the relief requested is a mixed standard of review." ***Allen***, 274 Wis. 2d 568, ¶9. First, we independently "determine whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief." ***Id.*** The circuit court must hold an evidentiary hearing if the motion raises such facts. ***Id.*** "However, if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." ***Id.***

¶29 Hatcher asserted in his postconviction motion that his trial counsel "did not conduct any investigation into the historical cell cite location mapping. In trial counsel's opinion, there was no need to investigate as the evidence … [that] Hatcher was in Green Bay at the time of the shooting was overwhelming." Hatcher also asserted that the type of cellphone data used at trial was inherently unreliable and has been questioned by courts from other jurisdictions. Hatcher cited publications and case law stating that cell towers can service cellphones "approximately 21 miles away" depending on several factors such as the type of tower, the terrain, the weather, and the amount of cellphone activity in the area. Additionally, Hatcher cited publications criticizing the "automatic" admission of the type of cellphone data evidence admitted at Hatcher's trial.

¶30 According to Hatcher, Warych failed to plot two of the seven interactions between Hatcher's cellphone and the towers depicted in GeoTime. He also alleged that the GeoTime map was not to scale and that the radiuses used for the sectors in GeoTime were "misleading" and had "no basis in actual network technology."[5] In addition, he argued that nothing in the record suggested that Warych "researched if the wireless network was adhering to operating standards," researched the weather on January 27, 2019, or conducted a "drive test" to verify the towers' sectors.

¶31 We agree with the State that Hatcher's motion for postconviction relief did not adequately plead facts demonstrating that his trial counsel performed deficiently by failing to adequately investigate the cellphone data evidence. Most prominently, Hatcher failed to allege in his postconviction motion what his trial counsel could have discovered through additional investigation that would have permitted counsel to cross-examine Warych in a more effective manner, or provide affirmative and specific evidence of Hatcher's location on the date of Edwards' death. Hatcher's trial counsel—and, frankly, the State—sufficiently established the limitations of the cellphone data that Edwards cited in his postconviction motion.

¶32 Significantly, the parties, and Warych, appeared to agree that the cellphone data evidence could not definitively state that Hatcher was near the crime scene around the time of the murder. On direct examination, Warych agreed with the State that the cellphone data was not "intended to indicate in any

---

[5] Hatcher further alleged that Warych incorrectly listed Edwards' address on the GeoTime map. However, Hatcher did not allege that Warych incorrectly mapped the address or, if she did, how far Edwards' actual residence is from the mapped address.

way where the actual device was located." Although Warych testified that "[i]t's typical for a mobile device to communicate with the closest tower to that device," and, therefore, she could state that a device is "likely" within a particular area around a particular tower, she also explained that a cellphone communicates with a particular tower in a given area due to any number of factors. According to Warych, those factors include the distance from the cellphone to the tower, topography, the height of surrounding buildings, and how busy an area is at that moment. As applied to the facts of this case, Warych stated that the cellphone data demonstrated to her that Hatcher's cellphone "communicated with" a tower that "is very close to" Edwards' address around the time of the murder. Warych conceded, however, that there was no way to know for certain whether Hatcher's cellphone was connecting with the closest tower or whether there was another tower closer to the device that it was not connecting with due to the factors she previously explained.

¶33 Warych confirmed on cross-examination that that if trial counsel called another device from the courthouse using his cellphone, his cellphone could communicate with the closest tower, but it could also communicate with another tower in the Green Bay area. Warych stated that she agreed with trial counsel that "you can't really predict exactly which tower this phone is going to ping off of at any given time" but that a cellphone "typically utilizes the closest, most available tower" with the strongest connection. Trial counsel conceded that the State could show that "if someone is connecting with a phone in Green Bay and then two hours later connecting with a phone toward[] Milwaukee," the assumption could be made "that the subject using the phone went from Green Bay to Milwaukee." However, trial counsel confirmed with Warych that the precise location of a cellphone is impossible to confirm by using the type of cellphone data introduced

15

at trial and that a "smaller geographic area" like Green Bay will have "multiple" towers. Trial counsel then questioned Warych on the various factors that could affect which tower a cellphone connects with where multiple towers are present. Thus, trial counsel adequately cross-examined Warych regarding the limitations on the cellphone location information, and Hatcher fails to state what additional helpful information further investigation by his trial counsel would yield.

¶34 Furthermore, Hatcher's postconviction motion failed to offer "proof to support a conclusion" that a *Daubert* motion "would have been successful." *See State v. Jackson*, 229 Wis. 2d 328, 344, 600 N.W.2d 39 (Ct. App. 1999). This court has previously rejected an argument made by a defendant that a circuit court erred by not subjecting an "intelligence analyst" to WIS. STAT. § 907.02 when the witness simply "t[ook] the information provided by a cell[]phone provider and transfer[red] that information onto a map." *State v. Cameron*, 2016 WI App 54, ¶¶6, 15, 370 Wis. 2d 661, 885 N.W.2d 611. In *Cameron*, the analyst testified at trial regarding "the process of cell[]phone location mapping as it pertained to activity from" the defendant and other relevant actors and "the timings of various calls." *Id.*, ¶6. We held that the analyst was not an expert and was not subject to § 907.02. *Cameron*, 370 Wis. 2d 661, ¶¶14-15.

¶35 Hatcher argues that GeoTime goes beyond transferring cellphone data information onto a map. In support of this argument, Hatcher contends that GeoTime includes visuals "indicating where [a] phone was at a particular time." We disagree. Warych testified multiple times that GeoTime could not show the exact location of a cellphone. Rather, the mapping demonstrated only which tower, and which sector of that tower, Hatcher's cellphone communicated with at certain times on the day of the murder. This evidence was substantially similar to that provided by the analyst in *Cameron*. Moreover, Warych explained, in detail,

16

the limitations of GeoTime and cellphone data generally. Thus, *Cameron* dictates that Warych's testimony did not constitute expert testimony subject to WIS. STAT. § 907.02 or *Daubert*. Trial counsel cannot be deficient for failing to file a meritless motion. *State v. Dalton*, 2018 WI 85, ¶¶53-54, 383 Wis. 2d 147, 914 N.W.2d 120.

### III. Amanda's identification

¶36    Hatcher further argues that the circuit court erred by permitting Amanda to identify Hatcher at trial under WIS. STAT. § 906.02, which provides, in relevant part, that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[6]

¶37    We review a circuit court's decision to admit evidence under the erroneous exercise of discretion standard. *State v. Warbelton*, 2009 WI 6, ¶17, 315 Wis. 2d 253, 759 N.W.2d 557. "A circuit court erroneously exercises its discretion when it bases its decision on a misstated fact or an incorrect view of the law." *Id.*

¶38    No Wisconsin appellate court appears to have specifically addressed WIS. STAT. § 906.02 with respect to eyewitness identification testimony.

---

[6] Prior to trial, Hatcher filed a motion to suppress evidence of the second photo array conducted with Amanda on due process grounds. Following a suppression hearing, the circuit court denied Hatcher's motion. On appeal, Hatcher does not renew his due process argument.

The State argues that Hatcher forfeited a challenge to Amanda's testimony by not objecting at trial to the identification under WIS. STAT. § 906.02. *See* WIS. STAT. § 901.03(1)(a). Because we ultimately conclude that the court did not err by admitting Amanda's testimony, we will address the merits of Hatcher's § 906.02 argument.

However, in ***Howland v. State***, 51 Wis. 2d 162, 171, 186 N.W.2d 319 (1971), our state supreme court stated that "[i]t is generally held that [a] witness'[s] lack of certitude as to whether the objects offered are the ones he [or she] saw on prior occasion goes to the weight the jury should give to the evidence, but lack of certitude does not preclude admissibility." Therefore, the court held that a witness's statement that evidence "could be" what she had witnessed during the commission of a crime did not preclude that witness from testifying at trial as to what she had observed. *See **id.*** at 171-72.

¶39    Likewise, courts from other jurisdictions have held that a witness's personal knowledge need not be absolute to satisfy statutory standards similar to the standard provided under WIS. STAT. § 906.02. For example, under Federal Rule of Evidence 602,[7] "the knowledge required" for a witness to have personal knowledge to testify "is not absolute or unlimited knowledge but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them." *See **United States v. Mendiola***, 707 F.3d 735, 741 (7th Cir. 2013). Moreover, "personal knowledge may include reasonable inferences as long as those inferences are grounded in observation or other firsthand personal experience." ***Id.*** "When addressing the admissibility of lay identification testimony, courts have been liberal in determining the extent of perception required to satisfy the [rule]." ***United States v. Bush***, 405 F.3d 909, 916 (10th Cir. 2005). "Courts have … preferred to leave to juries any assessment of the weight to be given to

---

[7] Federal Rule of Evidence 602 states, in pertinent part, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602.

such testimony when there exist questions regarding the quantity or quality of perception." *Id.*

¶40    Similarly, the Supreme Court of Washington, interpreting a statute nearly identical to WIS. STAT. § 906.02, held that "testimony should be excluded only if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge."[8]  *State v. Vaughn*, 682 P.2d 878, 882 (Wash. 1984); *see also State v. Grant*, 840 A.2d 541, 547-48 (R.I. 2004) (holding that a personal knowledge statute was "concerned with determining whether the witness had the *opportunity* to acquire the personal knowledge he or she is testifying to, not whether the witness's testimony is credible or accurate").

¶41    The non-Wisconsin cases cited above are particularly persuasive given that they interpreted statutory standards similar to the standard provided under WIS. STAT. § 906.02.  Consistent with that case law and *Howland*, Amanda had the requisite personal knowledge under § 906.02 to identify Hatcher at trial. No trier of fact could reasonably find that Amanda did not have firsthand knowledge of who entered her residence on the night of January 27, 2019. Amanda testified that she observed the suspect for several seconds after he and Edwards walked past her to the basement of her residence.  She testified that she "was a little curious at who was coming" into her residence so she "was paying attention to [Edwards] and the man at the door."

---

[8] The Washington statute interpreted and applied in *Vaughn* stated, in relevant part, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he [or she] has personal knowledge of the matter." *State v. Vaughn*, 682 P.2d 878, 882 (Wash. 1984) (citation omitted).

¶42    Hatcher asserts that Amanda "did not have personal knowledge sufficient to identify [him] as the shooter" because she only saw the individual who entered her residence for a brief period; her testimony describing the individual did not correspond to some of Hatcher's physical attributes;[9] she selected three different men during the two photo arrays, only one being Hatcher; and she could not definitively identify Hatcher until the preliminary hearing. However, the issue before the circuit court as it related to WIS. STAT. § 906.02 was whether Amanda had the opportunity to acquire personal knowledge of the suspect's identification. Conversely, the issue of what weight to give to Amanda's testimony was for the jury to decide. Accordingly, the court did not erroneously exercise its discretion by permitting Amanda to identify Hatcher at trial.

## IV. Speedy trial

¶43    Lastly, Hatcher asserts that his case should be dismissed with prejudice because his constitutional right to a speedy trial was violated. "Both the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution guarantee an accused the right to a speedy trial." *State v. Provost*, 2020 WI App 21, ¶25, 392 Wis. 2d 262, 944 N.W.2d 23. Whether a defendant has been denied his or her constitutional right to a speedy trial presents a question of law, which we review de novo, while accepting any findings of fact made by the circuit court unless they are clearly erroneous. *State v. Urdahl*, 2005 WI App 191, ¶10, 286 Wis. 2d 476, 704 N.W.2d 324.

---

[9] Amanda testified that the suspect who entered her residence was approximately 6'4" tall. The second photo array listed Hatcher as 6'1" tall.

¶44      When assessing whether a speedy trial violation has occurred, we apply the four-factor test established by the United States Supreme Court in ***Barker v. Wingo***, 407 U.S. 514, 530-33 (1972). ***Provost***, 392 Wis. 2d 262, ¶26. That is, we consider: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted the right to a speedy trial; and (4) whether the delay prejudiced the defendant. ***Id.*** The "test requires us to consider the totality of circumstances that exist in each specific case to determine if a speedy trial violation has occurred." ***Id.***

¶45      The State concedes, and we agree, that the length of the delay in this case was presumptively prejudicial because the State charged Hatcher in February 2019 and the trial did not commence until May 2021. *See **id.***, ¶27 ("A postaccusation delay is considered to be presumptively prejudicial when it 'approach[es] one year.'" (alteration in original; citation omitted)).

¶46      The second factor directs us to consider the reasons for the delay. "In doing so, we 'first identify the reason for each particular portion of the delay,' and we then 'accord different treatment to each category of reasons.'" ***Id.***, ¶28 (citation omitted). Delays caused by deliberate attempts by the government to hamper the defense weigh heavily against the State and in favor of a speedy trial violation. ***Id.*** "[D]elays caused by the government's negligence or overcrowded courts, though still counted, are weighted less heavily" in favor of a speedy trial violation. ***Id.*** "[I]f the delay is caused by the defendant, it is not counted." ***Id.*** (citation omitted).

¶47      The first delay occurred from Hatcher's February 19, 2019 initial appearance until his arraignment on April 23, 2019. At the February 19 initial appearance, Hatcher requested thirty days to retain private counsel. Hatcher

retained private counsel in March 2019. At his adjourned initial appearance, Hatcher waived the time limits to hold his preliminary hearing. Due to trial counsel's unavailability, the arraignment was not held until April 23, 2019. This delay is attributable to the defense because it was caused by Hatcher and his trial counsel. *See Vermont v. Brillon*, 556 U.S. 81, 94 (2009) ("[D]elays caused by defense counsel are properly attributed to the defendant.").

¶48 The second delay occurred from Hatcher's April 23, 2019 arraignment until December 9, 2019, with the latter date being when Hatcher's first trial counsel moved to withdraw. At Hatcher's April 23 arraignment, the parties scheduled a trial for August 2019. The scheduled trial did not occur because, in July 2019, the circuit court judge assigned to Hatcher's case retired, and the Honorable Tammy Jo Hock was assigned. However, regardless of the judicial substitution, the August 2019 trial date would likely have never occurred because, at an August 2019 status conference, Hatcher's trial counsel informed the court that Hatcher was requesting to move the trial date to January 2020 due to the amount of work that needed to be completed prior to the trial, including additional investigation. A trial was scheduled for January 2020.[10] Thus, the delay from Hatcher's arraignment until December 9, 2019, is not counted against either party. *See Leighton*, 237 Wis. 2d 709, ¶19 ("Although reasonable requests for time to prepare for trial may not be weighed against the defense, neither may the delays

---

[10] Hatcher also asserts that a delay occurred when the State moved for an adjournment of a motion hearing in August 2019. However, the January 2020 trial date was suggested by Hatcher and his trial counsel prior to the adjournment request. Moreover, Hatcher responded to the State's request by stating that he had no objection. Accordingly, we will not consider the adjournment in our analysis.

resulting from the defense's requests be weighed against the State, especially in the absence of a speedy trial demand.").

¶49 The third delay occurred from December 9, 2019, until March 22, 2020, with the latter date being when our state supreme court suspended jury trials due to the COVID-19 pandemic. At a final pretrial on December 9, Hatcher's first trial counsel moved to withdraw, stating that Hatcher had filed an Office of Lawyer Regulation (OLR) complaint against him. According to trial counsel, Hatcher had alleged, among other things, that trial counsel refused to file a speedy trial demand. The circuit court granted trial counsel's motion to withdraw after informing Hatcher that the trial date would need to be moved in order for a second attorney to get "up to speed." Hatcher was appointed second trial counsel by the State Public Defender's Office in January 2020, and a trial was set for June 2020. We agree with the State this delay—which resulted in Hatcher's January 2020 trial date being moved—was a direct result of Hatcher's conduct in filing the OLR complaint a month before his scheduled trial, and we conclude that the State should not be charged with this delay.

¶50 Hatcher also argues that the circuit court should not have permitted his first trial counsel to withdraw because that ruling had a "material[,] adverse effect[]" on him. However, Hatcher's OLR complaint created a manifest conflict of interest between him and his first trial counsel. This conflict of interest could have formed the basis for an ineffective assistance of counsel claim, and the circuit court properly permitted counsel to withdraw. *See* *State v. Love*, 227 Wis. 2d 60, 71, 594 N.W.2d 806 (1999).

¶51 The fourth delay occurred from March 22, 2020, until November 4, 2020, with the latter date being when the circuit court granted

23

Hatcher's second trial counsel's motion to withdraw. On March 22, our state supreme court suspended jury trials through May 2020 due to the COVID-19 pandemic. Because of ongoing concerns with COVID-19, the circuit court removed the June 2020 trial date from the calendar. A trial was scheduled for September 2020. Thereafter, a motion in limine hearing was held in August 2020. Hatcher, however, could not attend in-person or by audiovisual means because he had tested positive for COVID-19 after there was an outbreak in his unit at the jail. The circuit court scheduled a status conference for September 2020, and the trial date was removed from the calendar. At the status conference, the parties scheduled the trial for December 2020.

¶52 This court has recently held that although the State did not cause the COVID-19 pandemic, it was a product of government action because our state supreme court ordered the suspension of jury trials. *State v. Coleman*, 2025 WI App 7, ¶46, ___ Wis. 2d ___, ___N.W.2d ___ (2024). "Because the government put in place the orders that delayed [the defendant's] trial, the delay is attributed to the State." *Id.* However, we created a "category of reasons for state-attributed delay, which encompasses those delays that are caused by a reasonable government response to a legitimate public emergency." *Id.*, ¶56. We held that the COVID-19 pandemic was one such delay that fit into this category, that "the temporary suspension of jury trials was justified" due to the pandemic, and that the delay did not weigh against the State. *Id.*, ¶57. We are bound by published opinions from this court. *Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997). Hatcher's trial was delayed from March 22, 2020, until November 4, 2020, due to the government's justified response to the COVID-19 pandemic, and this delay should not be weighed against the State pursuant to *Coleman*.

¶53    The fifth delay occurred from November 4, 2020, until February 11, 2021, with the latter date being when the circuit court granted the State's motion to adjourn the trial.  In November 2020, Hatcher's second trial counsel moved to withdraw because the state supreme court had temporarily suspended his license to practice law in Wisconsin.  The circuit court granted trial counsel's motion to withdraw at a hearing on November 4, and the December 2020 trial date was removed from the calendar.  Hatcher contends that this delay was caused by our state supreme court's decision to suspend his trial counsel's license and should be weighed against the State.  Hatcher has cited no authority overcoming the general rule that "delays caused by defense counsel are properly attributed to the defendant." *See* **Brillon**, 556 U.S. at 94.  We therefore do not attribute this delay to the State.

¶54    The final delay occurred from February 11, 2021, to the start of Hatcher's trial on May 7, 2021.  Hatcher was appointed trial counsel for a third time in November 2020.  In December 2020, Hatcher filed a speedy trial demand.  The parties scheduled a trial for March 2021.  In February 2021, the State moved to adjourn the trial due to a witness being unavailable and Hatcher's unwillingness to allow the witness to testify by audiovisual means.  The circuit court granted the State's motion on February 11, 2021.  A trial was set for May 2021.  Witness unavailability is "intrinsic to the case" and is considered a valid reason for delay.[11]

---

[11] Hatcher argues that Wisconsin appellate courts have misinterpreted **Barker v. Wingo**, 407 U.S. 514 (1972), by holding that delays caused by witness unavailability are not counted against the State.  However, we are bound by prior decisions of our state supreme court and published opinions of this court.  **Cook v. Cook**, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).

*Provost*, 392 Wis. 2d 262, ¶28 (citation omitted). We therefore do not count this period against the State.

¶55 In all, none of the six delays in this case were the result of the State deliberately attempting to delay the trial in order to hamper the defense. *See Barker*, 407 U.S. at 531. In fact, none of the delays can be attributed to the State under binding precedent. Conversely, Hatcher was responsible for at least two of the delays. Thus, the delays in this case weigh in favor of a conclusion that Hatcher's right to a speedy trial right was not violated. *See Provost*, 392 Wis. 2d 262, ¶44.

¶56 The third factor directs us to consider whether the defendant asserted his or her right to a speedy trial. A "defendant's complete failure or delay in demanding a speedy trial will be weighed against him [or her]." *Hatcher v. State*, 83 Wis. 2d 559, 568, 266 N.W.2d 320 (1978). While Hatcher did assert his right to a speedy trial, he did not formally do so until December 10, 2020. The trial commenced less than five months after Hatcher made his demand for a speedy trial. Consequently, we conclude that this factor does not weigh in favor of Hatcher's claim that he was deprived of his right to a speedy trial. *See Provost*, 392 Wis. 2d 262, ¶45.

¶57 Hatcher contends that we should not consider the delay against him because he "instructed" his first trial attorney to file a speedy trial demand in March 2019, but counsel did not file that motion. Hatcher fails to recognize that he caused his January 2020 trial date to be removed from the calendar after he filed the OLR complaint against his first trial counsel. Otherwise, his trial would have commenced within one year of the State charging him.

¶58  The fourth factor directs us to consider whether Hatcher was prejudiced by the delays in bringing him to trial.  "When assessing this factor, we consider 'the three interests that the right to a speedy trial protects: prevention of oppressive pretrial incarceration, prevention of anxiety and concern by the accused, and prevention of impairment of defense.'"  *Id.*, ¶46 (citation omitted).

¶59  Hatcher was on an extended supervision hold at the time of his initial appearance in this case in February 2019.  Hatcher's supervision in that unrelated case was revoked in March 2019, and he was scheduled for release from that sentence in March 2021—roughly two months before his trial in this case. Any delay during this time period was not prejudicial to Hatcher because he would have remained incarcerated regardless of the status of the proceedings in this case. *See id.*, ¶49.

¶60  Nevertheless, Hatcher argues that he was prejudiced by the delays because he was cellmates with G.T. from October 2020 to January 2021, and G.T. provided testimony for the State at trial.  The State's collection of additional evidence, however, is not one of the identified interests protected by a defendant's right to a speedy trial.  *See Barker*, 407 U.S. 532-33 (stating, in relevant part, that a defendant may be prejudiced by a delay if he or she is hindered in his or her ability to gather evidence, contact witnesses, or otherwise prepare a defense); *Edwards v. State*, 636 S.W.3d 606, 615 (Mo. Ct. App. 2021) ("[T]he fact that the delay allowed the State to collect additional evidence did not constitute an impairment of [the defendant's] defense that affected his ability to adequately prepare his case."); *State v. Fernald*, 397 A.2d 194, 197 (Me. 1979) (same).

¶61  Hatcher also argues that he was prejudiced by being forced to proceed with trial counsel "he did not want."  Approximately two weeks before his

27

May 2021 trial, Hatcher sent a letter to the circuit court requesting that the court permit him to fire his third trial counsel and proceed pro se. After conducting a colloquy on the record at the final pretrial conference, the court denied Hatcher's request. As the State notes, had the court granted Hatcher's request, it would have created another delay in this case and been at odds with Hatcher's speedy trial demand. *See Leighton*, 237 Wis. 2d 709, ¶32 n.9.

¶62 In short, although the delay in this case was presumptively prejudicial, the remaining three factors do not support Hatcher's claim that he was deprived of his right to a speedy trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.